No. 2:19-cr-00150-JAM

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF CALIFORNIA


UNITED STATES OF AMERICA
Plaintiff-Appellee,


v.


JASON A. TOBEY,
Defendant-Appellant.


On Appeal from the United States District Court
for the Eastern District of California

Honorable Dennis M. Cota
United States Magistrate Judge

United States District Court No. 3:18-MJ-0024 DMC

---

### EXCERPTS OF RECORD

---

Heather E. Williams
Federal Defender
Carolyn M. Wiggin
Assistant Federal Defender
Robert Fleming
Certified Law Clerk
801 I Street, 3rd Floor
Sacramento, California 95814
Telephone: (916) 498-5700

Attorneys for Defendant-Appellant
JASON A. TOBEY

Index to the Excerpts of Record

Transcript of Motion Hearing Proceedings as to Jason A. Tobey
     held on May 7, 2019 (filed in case no. 3:18-mj-00024-DMC)
     Docket No. 28 (filed September 18, 2019)......................................................1

Notice of Appeal
     Docket No. 25 (filed August 28, 2019) .........................................................23

Decision and Judgment
     Docket No. 23 (filed August 15, 2019) .........................................................25

Transcript of Bench Trial held on May 9, 2019
     Pages: 23-27, 65-67, 71, 75-78, 87-88, 123, 186-93, 202-05,
     238, 247-49, 257, 260-68
     Docket No. 20 (filed May 30, 2019) .............................................................32

Motion to Dismiss by Jason A. Tobey
     Docket No. 8 (filed April 25, 2019) .............................................................76

Complaint
     Docket No. 2 (filed October 31, 2018).........................................................85

District Court Docket Sheet ......................................................................................89

1                    UNITED STATES DISTRICT COURT

2                  EASTERN DISTRICT OF CALIFORNIA

3                            --oOo--

4    UNITED STATES OF AMERICA,      ) Case No. 18MJ00024-DMC
                                    )
5              Plaintiff,           ) Redding, California
                                    )
6         vs.                       ) Tuesday,
                                    ) May 7, 2019
7    JASON A. TOBEY,                ) 11:00 a.m.
                                    )
8              Defendant.           )
     _____)

9

10                  TRANSCRIPT OF MOTION HEARING
                BEFORE THE HONORABLE DENNIS M. COTA
11                UNITED STATES MAGISTRATE JUDGE

12   APPEARANCES:

13   For the Plaintiff:            CHRISTOPHER S. HALES, ESQ.
                                   Office of the United States
14                                   Attorney
                                   501 I Street
15                                 Suite 10-100
                                   Sacramento, California 95814
16                                 (916) 554-2791

17                                 CARSON HARRIS, ESQ.
                                   Shasta-Trinity National Forest
18                                 3644 Avtech Parkway
                                   Redding, California 96002
19                                 (530) 226-2591

20   For the Defendant:           NATALIE R. LUDWIG, ESQ.
                                   TravisStroudLaw
21                                 1305 Solano Street
                                   Corning, California 96021
22                                 (530) 838-0828

23

24
     Proceedings recorded by electronic sound recording;
25   transcript produced by transcription service.

ii

Transcriber:                    Crystal Thomas
                                Echo Reporting, Inc.
                                2160 Fletcher Parkway, Suite P
                                El Cajon, California 92020
                                (858) 453-7590

1

1     REDDING, CALIFORNIA  TUESDAY, MAY 7, 2019  11:00 A.M.

2                          --oOo--

3      (Call to order of the Court.)

4            THE COURT:  Calling first the matter of United

5   States versus Tobey.

6            We have pending before the Court a motion to

7   dismiss and motion for pretrial diversion.  And I note that

8   the Court has also received an assortment of filings

9   associated with the upcoming trial.

10            I'll hear first from -- well, let's have

11   appearances first, sorry.  Appearances for plaintiffs -- I'm

12   sorry, plaintiff.

13            MR. HALES:  Good morning, your Honor.  Christopher

14   Hales and Carson Harris for the United States.

15            THE COURT:  Welcome, Mr. Hales.  Good to have you

16   here.  Mr. Harris.

17            And for the defense.

18            MS. LUDWIG:  Natalie Ludwig appearing for Travis

19   Stroud on behalf of Mr. Tobey.

20            THE COURT:  Ms. Ludwig.  Thank you.  It looks like

21   you're the moving party on this.

22            MS. LUDWIG:  Yes, your Honor.

23            THE COURT:  So I'll hear first from you.

24            MS. LUDWIG:  Your Honor, we have a couple

25   different issues.

2

1          First, we -- Mr. Tobey is asking, I've been told,

2 to be appointed counsel in this matter, because Mr. Stroud

3 has not been available for him.

4          THE COURT:  Okay.  So currently, your counsel of

5 record is being dismissed, Mr. Tobey?

6          THE DEFENDANT:  Your Honor, if I may.

7          I made some quick notes.  I'd just like to make

8 sure I say it clearly.  As you can see, this will now be the

9 third time that Mr. Stroud has not been able to appear here

10 for me and before you in this matter.

11          There have been numerous conflicts of interest

12 within this case.  The fact that he's been contracted now as

13 a -- he has different contracts and obligations in different

14 things around the county, and I'm not feeling as though I'm

15 able to get all the attention.  There are meetings that

16 we've planned that he has not shown up for, not been

17 available for, things like that.

18          And based on, as you can see, the condition of

19 that current motion, it was then made very clear to me that

20 this may be above his abilities here in your federal

21 courtroom and for me to be able to present and be

22 represented in a proper defense.

23          THE COURT:  All right.  Well, it's certainly your

24 prerogative who represents you or representing yourself in

25 these matters.

3

1          At this point, we do have a motion pending before

2   the Court brought on your behalf and a trial that the

3   Government has prepared for.

4          What are you proposing, Mr. Tobey?

5          THE DEFENDANT:  Sir, if it is possible to do so, I

6   have gone through your panel of appointee -- appointed

7   abilities and I believe the gentleman is here today --

8   actually, I think he's behind me -- Mr. John Kucera who

9   we've been able to speak with on the phone.

10          And he had said that if you were able to make an

11  appointment, he -- his calendar and his abilities seem to be

12  available to be an attorney of appointment by you to be able

13  to help me out in this matter.

14          THE COURT:  All right.  Well, the Court's not in a

15  position to appoint counsel for you.  However, to the extent

16  that you wish to change attorneys and engage Mr. Kucera,

17  that's certainly, again, within your prerogative.

18          Is that what you're intending to do at this time?

19          THE DEFENDANT:  My intention was to see if I could

20  get a court appointment as both my funds, my time and my

21  energy has been being exhausted by Mr. Travis and the

22  abilities of what we've been trying to do for my defense.

23          THE COURT:  This --

24          MR. HALES:  Your Honor, may I state the

25  Government's position when the time is right?

4

1          THE COURT:  Yes, you may --

2          MR. HALES:  I don't want to --

3          THE COURT:  -- because that will influence the

4    extent to which appointed counsel may or may not be

5    available.

6          MR. HALES:  All right.  Well, first, on the matter

7    of appointment, I don't know Mr. Tobey's financial situation

8    and what any affidavit he might have filled out before might

9    state, so I can't comment on whether he's entitled to

10   appointed counsel or not.

11         As far as a request of change of counsel at this

12   point, as your Honor knows, the case is set for trial on

13   Thursday.  We've got a witness on a plane now from Georgia

14   and two more who are coming, one from Portland and one from

15   Alaska.  We've been getting ready for this for a little bit

16   of time now.

17         One of the things that the Court can consider when

18   there is a request this late in the game to change counsel

19   before a trial is whether it's being done for purposes of

20   delay.  I'm not taking the argument right now that that is

21   100 percent the reason for this.  And I've heard what Mr.

22   Tobey has said.

23         There are a number of factors that the Court needs

24   to look at.

25         As I understand, Mr. Stroud is retained, which

5

1 changes the Court's analysis a little bit.

2          But I do want to say that the Court (sic) opposes

3 any continuance to the trial date for the reasons I just

4 stated with the witnesses in the air or about to be in the

5 air and that we've been preparing for this for some time.

6          And we would like to go through with the trial on

7 Thursday.

8          THE COURT:  Understood.

9          Two things that I would like to have happen.

10          Mr. Tobey, if you would fill out the financial

11 status form.  I don't believe the Court has that from you.

12          And, Mr. Hales, is it the Government's attempt to

13 seek incarceration?

14          MR. HALES:  In this case?

15          THE COURT:  Yes.

16          MR. HALES:  I think it depends on how the facts

17 come in at trial, your Honor.  It's a possibility.

18          THE DEFENDANT:  I'm sorry, I didn't catch that,

19 your Honor.  I was listening to instructions.

20          THE COURT:  In response to my inquiry about the

21 Government's objective at trial and whether they're seeking

22 incarceration, Mr. Hales indicated that's a possibility

23 depending on how the facts come in at trial.

24          Here's what I'd like to do.

25          Mr. Tobey, if you would take a few minutes to fill

6

1 out that form, I'm going to re-call this matter.

2          Mr. Hales, if you and Mr. Kucera could meet and

3 confer while we finish the rest of the calendar and address,

4 in the event that he is appointed, the viability of a

5 Thursday trial.

6          MR. HALES:  Yes, your Honor.

7          THE COURT:  And you're welcome to use the library

8 to meet and confer.

9          MR. HALES:  Thank you, your Honor.

10          MS. LUDWIG:  Thank you, your Honor.

11          THE COURT:  Mr. Kucera, thank you for being here.

12 If you could take a few minutes to meet with the

13 Government's representatives, we'll call this matter back

14 and see if we can work out your appointment.

15          MR. KUCERA:  All right.  And I wasn't trying to be

16 presumptuous by telling this gentleman that I would be

17 appointed.  I told him that there were a number of attorneys

18 and if the Court -- if it was my time, that the Court would

19 appoint me; otherwise, it might be somebody else.

20          THE COURT:  No presumptuousness in that at all.  I

21 appreciate the efficiency, and you understand the scenario

22 that we're dealing with here.  Based on the representations

23 from the Government that incarceration could be a potential,

24 I think that could clear the way for appointment of counsel.

25 But, again, I have concerns about timing and don't want the

7

1  trial to be delayed.

2          MR. KUCERA:  Understood.

3          THE COURT:  So if you guys could take a few

4  minutes to meet and confer, we'll bring you back in after

5  your would-be client has filled out the appropriate

6  paperwork and we'll address this later in the calendar.

7          MR. KUCERA:  And I do have two cases later with

8  your Honor.

9          THE COURT:  Very good.

10         MR. HALES:  Thank you, your Honor.  I'm on

11 calendar for one other matter.  The defendant's name is --

12     (Pause while the Court heard other matters.)

13         MR. HALES:  So if that matter is called, maybe Mr.

14 Harris can come get me and I'll come back in.

15         THE COURT:  Very good.  Thank you.

16         MR. HALES:  Thank you.

17    (Proceedings recessed briefly.)

18         THE COURT:  Calling the matter of United States

19 versus Tobey.

20         The Court notes that returning to the courtroom is

21 Christopher Hales and Carson Harris on behalf of the

22 prosecution, the Government, and Mr. Kucera and Mr. Tobey --

23         MR. KUCERA:  Yes, your Honor.

24         THE COURT:  -- on behalf of the defense.

25         We took a break so that the parties might be able

8

1  to meet and confer.

2          I'll hear from the Government first on this,

3  because the Court has serious concerns about the pending

4  trial and the prejudice to the Government if this matter

5  gets put off.

6          What, if anything, were you able to work out?

7          MR. HALES:  I think we haven't worked it out, I'm

8  sorry to inform the Court.  We did talk through every

9  potential option that we could I think to try and make this

10  work out with minimal collateral effects, but it looks like

11  we don't have a resolution.  And the Government would still

12  like to go to trial on Thursday, but there is of course Mr.

13  Tobey's pending request to change counsel.

14          We do have a witness who should be in the air

15  already, as I said, and others who are coming.  So of course

16  the Government wants to go to trial on Thursday.  The

17  Government is also very mindful that the Court has a series

18  of factors it has to take into account when the defendant is

19  asking to change counsel, as he's doing here.

20          And so at least from the prejudice side from the

21  Government's perspective, there's a lot of preparation

22  that's been done, obviously.  There are witnesses who are

23  coming.  And it is always very frustrating and not

24  altogether uncommon to have the reality of the trial trigger

25  these kinds of requests at the last minute.

9

1        I did hear Mr. Tobey speak, and I understand the

2   articulated reasons, aside from just the ones that he's

3   given the Court but the Government does have concern about

4   the delay and the cost to the Government, which is both time

5   and money with these witnesses that are already coming.

6        So that's where we are.  It doesn't leave the

7   Court in a good position as far as what to do next, and I'm

8   sorry for that.  I wish we had an easier answer.

9        THE COURT:  So noted, Mr. Hales.  I appreciate the

10  update.  is

11        And, Mr. Kucera, let me say that the Court

12  appreciates your willingness to be involved and understands

13  of course that readying for trial two days from now is not

14  likely to be a possibility even for a super lawyer.

15        MR. KUCERA:  And I'll represent to the Court that

16  we discussed that.  There's no way I could be.

17        THE COURT:  Yeah.  I think that that's

18  unreasonable.

19        I think that -- and the Court will also note, Mr.

20  Tobey, that I don't see any bad faith here.  I don't view,

21  based on the facts before the Court, this being gamesmanship

22  or an effort to forestall.

23        I understand that you have had some challenges.

24  However, it does create a substantial amount of prejudice

25  both to the Government and to this Court to have the matter

10

1  continued at this late date.

2        If there was need for a change of counsel, it

3  really needed to be identified in advance of the eve of

4  trial.  And at this point, the Court is reluctant, absent an

5  informal arrangement between the parties, to allow on the

6  eve of trial, your counsel to step down.

7        I think that there is a matter of professional

8  responsibility to you that he either finish the trial or

9  have someone from his office be prepared to proceed, because

10  to accommodate a change on the eve of trial is unduly

11  prejudicial and is unfortunately not something that I can

12  accommodate at this point, given the status of all of the

13  parties and, as I said, the Court as well.

14        I'll hear from counsel or to the extent that you

15  want to turn it over to your client in this regard.

16        MS. LUDWIG:  Yes, your Honor.

17        There was one other issue.  There is discovery

18  that we have that's on a disk that was password protected

19  from the plaintiff that we received.  We've been working

20  with them trying to gain access to the CD.

21        To this date, we have never seen what's on it.

22  And if it's going to be used in court Thursday, we have no

23  way to prepare for that.  Today, they said that they would

24  meet me after court and print it out for me, but without

25  knowing what's on there, I have no idea how we would prepare

11

1  for that for Thursday.

2        MR. HALES:  I can address that, your Honor.

3        THE COURT:  All right.  I hate to get beyond the

4  immediate issue though of the representation.

5        Let's take up both the pending motion and this

6  discovery issue separately.

7        At this point, defense counsel is unavailable, is

8  unprepared.  What -- I understand from Mr. Tobey's earlier

9  comments that there are concerns about the adequacy of his

10 representation.  But we've got a trial in two days.

11       MS. LUDWIG:  Your Honor, Mr. Stroud did take the

12 Public Defender contract in Glenn County and he has not been

13 available to meet with Mr. Tobey and to prepare for this

14 case.

15       THE COURT:  And so the representation to the Court

16 is that if we convene trial in two days, he's not here?

17       MS. LUDWIG:  He will be here.  He will be here.

18 However unprepared he is, he will be here.

19       THE COURT:  Well, at this point, I don't feel like

20 it's reasonable that he be released.  I have no formal

21 motion before the Court in that regard, and had he initiated

22 a proper motion in order for it to be timely, he would have

23 had to bring it well before this point.

24       While the concerns over his performance are duly

25 noted, Mr. Tobey, the Court cannot accommodate a --

12

1 presuming this is a motion for him to be excused, the Court

2 cannot accommodate that, and the motion is denied.

3          I want to again note that the Court appreciates

4 Mr. Kucera's willingness to even evaluate the situation.

5 But short of a stipulation --

6          And I'm hearing from the Government that a

7 stipulation is not available at this time?

8          MR. HALES:  As to a continued trial date, your

9 Honor?

10          THE COURT:  Correct.

11          MR. HALES:  No, your Honor.  We really don't want

12 to with the witnesses coming out.  No, the Government's not

13 willing to stipulate.  And more particularly, the Government

14 I think is rightfully concerned about if it happens in this

15 case, it can happen in another case.  We've had a series of

16 communications for a period of time.  The trial date comes

17 and we're ready.

18          I mean this is hugely disruptive.  And I'm not

19 suggesting at all that this is what Mr. Tobey is trying to

20 do here, but --

21          THE COURT:  No.  I'm not seeing bad faith actions

22 here.

23          MR. HALES:   Right.  But swapping out counsel at

24 this point right before trial, it is cynically used at times

25 in other cases for the purpose of disrupting the

13

1 Government's preparation for the case, the fact that we're

2 all ready to go and then this kind of thing happens.

3          And we don't want to set a precedent of agreeing

4 to this when it's coming at this late date and is this

5 disruptive for the Court and for the Government's schedule.

6          And so for all those reasons, that's why I'm not

7 stipulating at this time.

8          THE COURT:  Well, and I am not -- I'm not

9 comfortable with the idea of a change of counsel on the eve

10 of trial.  Whether this was a civil matter or a criminal

11 matter, it is simply unduly prejudicial and inappropriate.

12          So with that, I suggest that arrangements be made

13 for an appearance on Thursday.

14          Are you prepared, Counsel, to argue the motion

15 today?

16          MS. LUDWIG:  Yes, your Honor.  I think we could

17 basically submit on the pleadings in that case.

18          THE COURT:  All right.  Before we get to that, I

19 don't want to burn any more of Mr. Kucera's time.

20          Anything else for the Court today, sir?

21          MR. KUCERA:  No, your Honor.

22          THE COURT:  All right.  Again, with the Court's

23 thanks for your willingness to step in and try to remedy

24 this situation, I think that unfortunately it's simply too

25 late to deal with a Thursday trial date.

14

1        I appreciate your willingness to review your

2   calendar and see if it was possible.

3        MR. KUCERA:  And we did discuss the facts and a

4   number of possible alternatives under the circumstances that

5   it can't go anywhere, so -- thank you.

6        THE COURT:  Very good.  Thank you.

7        Now, then, turning to the pending motion to

8   dismiss and defendant's motion for pretrial diversion, the

9   Court has a number of concerns.

10       And moving forward, Counsel, on your submission

11  here, the -- addressing first the motion to dismiss.

12  Effectively a 12(b) motion finds itself without a home here

13  in this criminal case.  There's really no vehicle for a

14  summary judgment.  And the motion to dismiss is

15  inappropriate here.  The pleading is adequate to go forward.

16  The factual disputes rising from that pleading go to the

17  merits of the case, and that's the essence of the trial.

18       So in the context of this federal case, had the

19  matter been of a civil nature, perhaps a 12(b) could have

20  been addressed, again, at an earlier time.  But a motion to

21  dismiss in this criminal action is inappropriate.

22       As far as the pretrial diversion agreement, that

23  is simply outside what the Court can provide.  That's a

24  prosecutor's discretion.  And I see no authority to overcome

25  the Ninth Circuit opinion in <u>United States v. Constantino</u>

15

1  that was cited by the Government.

2          Again, Rule 11 prohibits the Court from

3  participating in any plea negotiations here.  And

4  effectively getting involved in and a pretrial diversion

5  order would be inappropriate.

6          So the motions as pending before the Court are

7  each denied.

8          And the Court notes that separate from the motions

9  initiated by the defendant, there is a motion under Rule 615

10 for purposes of the trial to exclude all witnesses.  The

11 Court's inclined to grant that motion and to take that

12 matter up today simply for housekeeping purposes at the time

13 of trial.

14         So, Counsel, if you could alert the defense

15 witnesses that they will not be permitted in the courtroom

16 until such time as they testify, and then after they've been

17 released as witnesses, they can of course stay in and watch

18 the balance of the trial.

19         Party witnesses, of course, Mr. Tobey, you will

20 allowed to be here through the pendency and the

21 representatives for the Government on the prosecution side.

22         Do we have expert witnesses coming in?

23         MR. HALES:  No, none that I would characterize as

24 experts, your Honor.  I mean there's a helicopter pilot,

25 we'll talk about what he was actually doing, but that's not

16

1  in any way expert testimony.

2         THE COURT:  All right.  Then just for notice to

3  the defense side, the Court is going to grant the

4  Government's motion under Rule 615 and witnesses will be

5  excluded.

6         We will start promptly on Thursday.  And the Court

7  will take up any pretrial motions or housekeeping at that

8  time.  But the expectation is that we will proceed

9  straightaway with opening statements and have witness

10 testimony.

11        MR. HALES:  Thank you, your Honor.

12        MS. LUDWIG:  Your Honor, I think Mr. Tobey has a

13 statement he would like to make.

14        THE DEFENDANT:  Yes, sir, if it's possible.  The

15 reason I'm inquisitive here is because I submitted persons

16 to be in my defense witness corral and as I'm checking here

17 with Natalie, none of those are going to be here or were

18 subpoenaed or were set to be here for me.

19        THE COURT:  In terms of arrangements from your

20 counsel's office to --

21        THE DEFENDANT:  Yes, sir.  Which is what's going

22 back to this originality, sir.  This is what I'm getting at

23 with the lack of ability to perform.

24        THE COURT:  And unfortunately, that's going to

25 need to be an issue between you and your counsel.

17

1  Certainly, it is the Court's order that witnesses be here

2  and be prepared to proceed on Thursday and that can be

3  relayed to defense counsel, that he has an obligation there

4  notwithstanding his other obligations and responsibilities.

5           Before we broke, you had raised an issue regarding

6  discovery.

7           MS. LUDWIG:  Yes, your Honor.

8           THE COURT:  And I had cut you off.

9           Mr. Hales, what's our remedy there?

10          MR. HALES:  Yes, your Honor.  We sent a disk with

11  additional discovery.  It's about 25 pages.  We have to, by

12  our rules, encrypt them.  I can't send it out any other way.

13          I spoke to the paralegal or assistant in our

14  office to try and get that open.  We weren't able to do

15  that.  So after I found out that was happening, I printed

16  paper copies.  And Ms. Swanson, who is the paralegal in our

17  office, as I understand it sent it out.

18          I've been told today they haven't received that

19  yet, which I was surprised about because it was several days

20  ago that we sent out the paper copies.  And so what I told

21  defense counsel was if those really haven't arrived yet,

22  then I'm happy to go back to Mr. Harris's office today.

23          I've got digital copies.  I can access of all of

24  this and I can print them out while they wait and hand those

25  additional 25 pages to them.

18

1         Most of it is photos.  There are a few additional

2 witness statements in there, but it's not so much that it

3 can't be reviewed I think in an afternoon.

4         THE COURT:  Yeah, 25 pages, Mr. Tobey, I think

5 that that's something that can be reviewed and I would ask

6 that the Government make those available.

7         To the extent that you can produce hard copies

8 this afternoon, Mr. Harris, that would be much appreciated

9 and I think appropriate, given the challenges that we're

10 dealing with.

11         The Government of course puts on its case first,

12 Mr. Tobey.  And to the extent that there's scheduling

13 difficulties, I would direct that the parties meet and

14 confer and coordinate to minimize difficulties in that

15 regard.  If we need to take one of your witnesses out of

16 order because they're only available in the morning or need

17 to testify at a certain time, then the Court will attempt to

18 accommodate that in consideration of the challenges you're

19 facing.

20         But we do need to be ready to proceed straightaway

21 at 9:00, and we'll go forward with the trial.

22         THE DEFENDANT:  I will figure out where this is at

23 with whatever witnesses and/or who's been told what, since I

24 do not know at this point, your Honor.

25         THE COURT:  All right.  Very good.

19

1          Anything else?

2          MR. HALES:  No, your Honor.

3          THE COURT:  Anything from the defense?

4          MS. LUDWIG:  No, your Honor.

5          THE COURT:  All right.  Thank you.  We'll see you

6   Thursday.

7          MR. HALES:  Thank you.

8       (Proceedings concluded.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

20

1          I certify that the foregoing is a correct

2     transcript from the electronic sound recording of the

3     proceedings in the above-entitled matter.

4

5     /s/Dee Gregory                    9/17/19
      Transcriber                       Date

6

7     FEDERALLY CERTIFIED TRANSCRIPT AUTHENTICATED BY:

8

9     /s/L.L. Francisco
      L.L. Francisco, President
10    Echo Reporting, Inc.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

*Echo Reporting, Inc.*

# UNITED STATES DISTRICT COURT

for the

Eastern District of California

| | |
|---|---|
| United States of America | Case No.  3:18-mj-0024 DMC |
| v. | |
| JASON A. TOBEY | Notice of Appeal |
| Defendant | |

_____

Now come, Defendant, Jason A. Tobey hereby gives notice that he is appealing the DECISION AND JUDGMENT filed and endorsed by Dennis M. Cota United States Magistrate Judge on August 15, 2019.  The decision was **IN THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF CALIFORNIA.**

Furthermore, it should be noted that this matter is being appealed to the **District Judge** of this UNITED STATES DISTRICT COURT for the Eastern District of California.

Furthermore, it should be noted that Travis E. Stroud is only filing this Notice of Appeal for Mr. Tobey on a specialty basis,  it does not establish that Travis E. Stroud will represent Mr. Tobey in this appeal.

Respectfully submitted, August 28th, 2019

Travis E. Stroud, Attorney at Law, 279606

/s/ Travis E. Stroud

Excerpts of Record, p. 23

# PROOF OF SERVICE

I am a citizen of the United States and a resident of Tehama County, California; I am over the age of eighteen (18) years and not a party to the within action; my business address is 1120 Solano Street, Corning, California, 96021.

On the date stated below, I served the within documents:

Notice of Appeal

 X     by placing a true copy thereof enclosed in a sealed envelope postage paid in the designated area for outgoing mail addressed as set forth below:

McGREGOR W. SCOTT
United States Attorney
CHRISTOPHER S. HALES
Assistant United States Attorney
501 I Street, Suite 10-100
Sacramento, CA 95814


_____ by placing a true coy thereof enclosed in a sealed envelope with a shipping label approved by California Overnight and fees prepaid, in a drop box regularly maintained by California Overnight which guarantees overnight delivery, addressed as set forth below:


_____ by personally delivering a true copy thereof to the person and at the address set forth below:


__ x ___ by having transmitted a true copy thereof via email to the person and at the email number set forth below:
                crharris@fs.fed.us

_____ by facsimile I caused the document to be sent via facsimile to the number listed below:

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

EXECUTED, August 25th, 2019 at Corning, Tehama County, California.

/s/ Travis E. Stroud

Excerpts of Record, p. 24

1

2

3

4

5

6

7

8                          **IN THE UNITED STATES DISTRICT COURT**

9                         **FOR THE EASTERN DISTRICT OF CALIFORNIA**

10

11    UNITED STATES OF AMERICA,                    No. 3:18-MJ-0024-DMC

12                    Plaintiff,

13            v.                                    <u>DECISION AND JUDGMENT</u>

14    JASON A. TOBEY,

15                    Defendant.

16

17            This matter came on regularly for bench trial on May 9, 2019, at the United States

18    District Court in Redding, California, before the Honorable Dennis M. Cota, United States

19    Magistrate Judge presiding.  The government appeared by and through Christopher S. Hales,

20    Assistant United States Attorney.  Defendant appeared by and through Travis E. Stroud, Attorney

21    at Law.

22            The matter was before the Court by way of Complaint filed on October 31,

23    2018.  In the sole count of the Complaint Jason A. Tobey was charged with violating 36 C.F.R.

24    § 261.3(c).  Pursuant to 36 C.F.R. § 261.3(c), the following is prohibited:

25                    Threatening, intimidating, or intentionally interfering with any
                      Forest officer, volunteer, or human resource program enrollee, while
26                    engaged in, or on account of, the performance of duties for the protection,
                      improvement, or administration of the National Forest System or other
27                    duties assigned by the Forest Service.

28    / / /

                                              1

1           At trial, the government adduced the following evidence:

2           Exhibit 1      Map of the Delta and Hirz Fires.

3           Exhibit 2      California Master Cooperative Wildland Fire Management
4                          and Stafford Act Response Agreement.

Exhibit 3      U.S. Department of Agriculture Forest Service Contract
5                          with Aspen Helicopters, Inc.

6           Exhibit 4      Resource Order – T3 Helicopter.

7           Exhibit 5      Resource Order – Owen Solomon.

8           Exhibit 6      Photos of Mott Airport.

9           Exhibit 7      Photos of Fire Crew Clothing.

10          Exhibit 8      Ariel Photograph of Mott Airport.

11          Exhibit 9      Emergency Facilities & Land Use Agreement.

12           The government also provided the testimony of John Casey, Forest Aviation

13  Officer, Jeffrey Schifflett, Monongahela National Forest Firefighter, Owen Solomon, State of

14  Alaska Division of Forestry and USFS Contractor, and John Dumont, Helicopter Pilot.

15           The defense adduced the following evidence:

16          Exhibit A     Photo of Entrance to Mott Airport (with vehicle in phono
17                         redacted).

Exhibit B     Photo of Gate into Heli Base (with tape measurer redacted).
18

Exhibit C     Statement taken by Lisa Wilson.
19

Exhibit D     Video of area on USB.
20

Exhibit E     Tree Limb (admitted over objections).
21

22           The defense also provided the testimony of Sam Kubowtiz, Siskiyou County

23  Sheriff's Department, Cassandra Novak Tobey, Defendant's spouse, and Defendant Jason A.

24  Tobey.

25           The testimony and evidence introduced at trial having been fully considered, this

26  Court finds as follows: The evidence introduced at trial on behalf of the United States (hereafter

27  "the Government") proved beyond a reasonable doubt that Defendant Tobey's statements and

28  actions on September 23, 2018, and thereafter on September 24, 2018, in confronting US Forest

2

1  Service employee Jeff Schifflett, constituted a violation of 36 CFR 261.3(c).

2

3  **1. FINDINGS OF FACT**

4  　　As of the events at issue on September 23-24, 2018, the United States Forest

5  Service was utilizing the Mott Airport near Mt. Shasta City, California as a helibase, from which

6  the Forest Service deployed helicopters in conjunction with active firefighting efforts. Defendant

7  Tobey's residence is at 1217 Mott Airport Road, Mt. Shasta, on property near or adjoining the

8  Mott Airport facilities. As helicopters used by the Forest Service in fighting the Delta fire were

9  flown in and out of the Mott Airport in September 2018, one or more of those aircraft flew over

10 Defendant Tobey's property. In response to this helicopter traffic, and the noise and disruption

11 allegedly caused by that air traffic, Defendant traveled to Mott Airport on both September 23 and

12 24th, 2018. There Defendant Tobey encountered full time US Forest Service employee Jeffrey

13 Schiflett.

14 　　On each occasion that Defendant made contact, Forest Officer Schiflett was

15 dressed in a US Forest Service attire consistent with his assigned tasks of performing road guard

16 duty at an entry gate into the Mott Airport during the firefighting operations, and his role as a

17 crew member on one of the helicopters operating from Mott Airport.  The Court finds that at all

18 times in his dealings with Defendant Tobey, Mr. Schiflett was acting in the capacity of a "Forest

19 Officer," as defined in 36 C.F.R. § 261.2, and was performing an official duty for the "protection,

20 improvement, or administration of the national Forest," as set forth in 36 C.F.R. § 261.3(c).

21 　　Defendant contends that on repeated occasions, including after Defendant

22 expressed his concerns about the helicopter traffic over his house, that the pilots operating the

23 helicopters for the US Forest Service flew low enough to rattle Defendant's dishes, scare

24 Defendant, his wife and their dog, and allegedly break a large tree limb (Def. Exhibit E). The

25 Court finds that based on the initial flights over Defendant's residence, Defendant Tobey was so

26 agitated that Defendant drove to Mott Airport on September 23, 2018, with the stated objective of

27 confronting the pilot of the helicopter and stopping the continued flights over Defendant's

28 property.

3

1    At the instruction of Forest Officer Schiflett, Defendant Tobey stopped at an

2  entrance to Mott Airport. There he addressed Forest Officer Schiflett and stated his anger over the

3  pending helicopter operations. In the course of his comments to Forest Officer Schiflett,

4  Defendant Tobey threatened to shoot the subject helicopter out of the sky if it flew over again.

5  While Defendant attempts in his closing brief to characterize Defendant's statements as merely

6  referencing the need to "defend his airspace," the Court finds the contrary testimony of the

7  Government witnesses in this regard to be more credible on the issue of what was stated by

8  Defendant Tobey.  On Defendant's initial encounter with Forest Officer Schiflett on September

9  23, 2018, Defendant Tobey stated: "I will shoot that motherfucker out of the sky if I have to."

10  When Defendant Tobey returned to the Mott Airport on September 24, 2018, he made the

11  statement: "Did I not make myself clear to you yesterday, or am I just out of my fucking mind?"

12    The Court finds each of Defendant Tobey's statements to be threatening,

13  intimidating, and intentionally interfering with Forest officer Schifflett while he was engaged in

14  the performance of duties for the protection of the National Forest System at the Mott Airport and

15  in conjunction with the firefighting efforts being undertaken from that location. The plain

16  objective of Defendant's initial statement was to use the threat of a potential attack on the aircraft

17  being used in the Forest Service fire operations to intimidate Forest Officer Schiflett into

18  restricting or modifying those operations to no longer include flights over Defendant Tobey's

19  residence. Notwithstanding Officer Schiflett's explanation of the need to navigate the helicopters

20  in patterns dictated by wind and existing conditions and objectives, Defendant Tobey returned to

21  Mott Airport on September 24, 2018 with a further intimidation fueled statement, referencing and

22  renewing the threat that he previously intended to "make clear."

23    The Court finds that the statements made by Defendant Tobey on each of these

24  occasions were not conditional, as subsequently maintained by Defendant.  The message

25  conveyed by the language used by Defendant on September 23, 2018 expressly stated that the

26  threatened action would follow any continued operation of the helicopters over his property.

27  Defendant's statement of September 24, 2018 then referred back to that statement and renewed

28  the threat that he intended to "make clear" in his earlier comment. Defendant's threat was not

4

1   conditional on anything and would be given effect on the continuation of the status quo,

2   specifically, the continued helicopter operations. Even assuming arguendo the statements at issue

3   could be read as conditional threats, Defendant Tobey's liability under 36 C.F.R.

4   § 261.3(c) remains here, where the activity of threatening and intimidating, even conditionally,

5   constituted acts in violation of the statute.

6

7                              **2.  CONCLUSIONS OF LAW**

8               Defendant's statements to Forest Officer Schiflett on both September 23 and 24,

9   2018, resulted in both intimidation and intentional interference with a Forest Officer's duties of

10  protecting the National Forest System, and as such, Defendant's actions were acts in violation of

11  36 C.F.R. § 261.3(c). Defendant Tobey's statements constituted intimidation, in that those

12  statements sought to use Defendant's threatened acts of violence in shooting down a helicopter to

13  compel Forest Officer Schiflett to comply with Defendant's objectives. To the extent Defendant's

14  objectives included the goal of limiting the flight operations employed by the U.S. Forest Service,

15  Defendant's statements also constituted interference generally with a program for the protection

16  of the National Forest System. More specifically, Defendant's threatening statements required

17  Forest Officer Schiflett's immediate attention and response, and so interfered with Forest Officer

18  Schiflett's performance of his duties for protection of the National Forest System.

19              Defendant's argument that the statements at issue constitute speech protected

20  under the First Amendment is unavailing as a matter of law. Statements such as those at issue

21  here, that can reasonably be interpreted as expressing an intent to harm or assault, enjoy no

22  constitutional protection as free speech under the First Amendment.  See U.S. v. Hoff, 22 F. 3d

23  222 (9th Cir. 1994); U.S. v. Poocha, 259 F.3d 1077 (9th Cir. 2001). While the Supreme Court's

24  jurisprudence protects a significant amount of verbal criticism and challenge directed at law

25  enforcement, where, as here, words by their very utterance inflict harm in the form or

26  intimidation or interference with the duties of an officer, such words fail to meet any

27  "conceivable definition of protected speech." Hoff, 22 F.3d at 223. The First Amendment can not

28  be employed to protect a statement intended to harm or intimidate a Federal employee. In making

5

Case 2:19-cr-00150-JAM   Document 23   Filed 03/25/19   Page 6 of 96

1    statements in violation of 36 C.F.R. § 261.3(c), Defendant Tobey is afforded no free speech

2    safeguards in the First Amendment.

3              Neither can Defendant Tobey here rationalize the actions of September 23-24,

4    2018, as justified or necessitated by the alleged disruptive helicopter air traffic. Even assuming

5    arguendo that employing helicopters in firefighting efforts at issue resulted in the disruption and

6    damage charged by Defendant (a conclusion neither adopted nor addressed by this Court),

7    Defendant's redress for such damage does not permit the violation of 36 C.F.R. § 261.3(c).

8    Irritation and anger can never be the catalyst for undertaking self-help outside the law.

9    / / /

10   / / /

11   / / /

12   / / /

13   / / /

14   / / /

15   / / /

16   / / /

17   / / /

18   / / /

19   / / /

20   / / /

21   / / /

22   / / /

23   / / /

24   / / /

25   / / /

26   / / /

27   / / /

28   / / /

6

### 3. VERDICT

The Court finds Defendant Jason A. Tobey guilty of violating 36 C.F.R. § 261.3(c), a Class B Misdemeanor. While this violation is otherwise subject to a maximum possible penalty of 6 months imprisonment and up to a $5,000 fine, in consideration of the evidence received at trial and the absence of any prior record of offense by this Defendant, the Court rules as follows:

       1.    Defendant shall pay a fine of $500 within 15 days of the date of this Judgment; and

       2.    Defendant shall be placed on an unsupervised court probation for a period of twenty-four months, commencing on the date of this Judgment, during which period Defendant shall not commit another Local, State, or Federal crime.

### 4. APPEAL RIGHTS ADVISEMENT

Pursuant to Rule 58(g)(2)(13) and Rule 32(j) of the Federal Rules of Criminal Procedure, you have the right to appeal the judgment of conviction or sentence to the United States District Court within ten days of the entry of this Judgment. You must file your Notice of Appeal with the Clerk of the United States District Court, Eastern District of California, 501 'I' Street, Sacramento, California 95814. You are further advised that if you are unable to pay the costs of appeal, you may seek permission to appeal in forma pauperis.

Dated: August 15, 2019

DENNIS M. COTA
UNITED STATES MAGISTRATE JUDGE

7

```
 1                   UNITED STATES DISTRICT COURT

 2                  EASTERN DISTRICT OF CALIFORNIA

 3                            --oOo--

 4  UNITED STATES OF AMERICA,      ) Case No. 18MJ00024-DMC
                                   )
 5           Plaintiff,            ) Redding, California
                                   )
 6       vs.                       ) Thursday,
                                   ) May 9, 2019
 7  JASON A. TOBEY,                ) 9:00 a.m.
                                   )
 8           Defendant.            )
    _____)
 9

10                  TRANSCRIPT OF BENCH TRIAL
            BEFORE THE HONORABLE DENNIS M. COTA
11             UNITED STATES MAGISTRATE JUDGE

12  APPEARANCES:

13  For the Plaintiff:          CHRISTOPHER S. HALES, ESQ.
                                Office of the United States
14                                 Attorney
                                501 I Street
15                              Suite 10-100
                                Sacramento, California 95814
16                              (916) 554-2791

17                              CARSON HARRIS, ESQ.
                                Shasta-Trinity National Forest
18                              3644 Avtech Parkway
                                Redding, California 96002
19                              (530) 226-2591

20  For the Defendant:          TRAVIS E. STROUD, ESQ.
                                NATALIE R. LUDWIG, ESQ.
21                              TravisStroudLaw
                                1305 Solano Street
22                              Corning, California 96021
                                (530) 838-0828
23
                                530-838-0828
24
    Proceedings recorded by electronic sound recording;
25  transcript produced by transcription service.
```

ii

Court Recorder:                    Christy Pine
                                   United States District Court
                                   Eastern District of California
                                   Redding Federal Courthouse
                                   2986 Bechelli Lane
                                   Redding, California 96002


Transcriber:                       Crystal Thomas
                                   Echo Reporting, Inc.
                                   2160 Fletcher Parkway, Suite P
                                   El Cajon, California 92020
                                   (858) 453-7590

23

1  about protection areas, boundaries and responsibilities.

2       Why is it important for a joint agreement like the CFMA

3  to address that topic?

4  A    So fires typically won't stay within their boundaries

5  or areas, so it will move across forest lands to other

6  direct protection areas.  And so to have these agreements in

7  place, it allows us to mobilize resources and equipment so

8  they can work on those jurisdiction or geographical areas.

9  Q    Were you working for the U.S. -- I mean I believe it's

10 covered from what you said before, but were you working for

11 the U.S. Forest Service in September of 2018?

12 A    Yes.

13 Q    Okay.  And are you familiar with a fire called the

14 Delta Fire?

15 A    I am, yes.

16 Q    And from your work, are you familiar with where that

17 fire started, approximately?

18 A    Yes.

19 Q    Okay.  Where did that fire start?

20 A    Right off the Interstate 5 corridor at the Delta exit

21 in California.

22 Q    Are you familiar with the term called "direct

23 protection area"?

24 A    Yes, I am.

25 Q    What does that term mean?

24

1  A     The direct protection, or other (sic) known as DPA,

2  that's a location or a term that identifies where resources

3  are responsible for responding if there is a start or an

4  assist that needs to take place on Forest Service land.

5  Q     Okay.  And whose direct protection area did the Delta

6  Fire start in?

7  A     That was the Shasta-Trinity National Forest.

8  Q     Of the United States Forest Service?

9  A     Yes, sir.

10  Q     And since the time that fire started, have you become

11  familiar with the area that was burned by the Delta Fire?

12  A     Yes.

13  Q     What about the Hirz Fire, H-I-R-Z, are you familiar

14  with that fire as well?

15  A     Yes, I am.

16  Q     Okay.  And have you spent any time actually in the air

17  yourself, observing the areas that were burned by those

18  fires?

19  A     Yes, I've spent hours flying as an air attack group

20  supervisor.

21  Q     I'd like to ask you to look at what's been marked as

22  Government's Exhibit 1 in the binder in front of you.  And I

23  ask if you recognize that document.

24  A     Yes, I recognize it.

25  Q     What is it?

25

1  A    That's the map, the incident of the Hirz perimeter and

2  the Delta Fire of 2018.

3  Q    And is that a true and accurate representation of the

4  areas burned by the Delta and Hirz fires in 2018?

5  A    Yes, it is.

6          MR. HALES:  Your Honor, at this time the

7  Government moves to admit Exhibit 1.

8          MR. STROUD:  No objection, your Honor.

9          THE COURT:  Exhibit 1 will be admitted.

10          Could you clarify for the record the chronology

11  here as between the Delta and Hirz fires?

12          MR. HALES:  Oh, yes, I was intending to do that,

13  but I see why that makes sense, your Honor.  Thank you.

14  BY MR. HALES:

15  Q    Which fire was burning first, Hirz or Delta?

16  A    The Hirz was the first incident that was burning.

17  Q    Okay.  So were there already -- was there already an

18  interagency effort to fight the Hirz Fire ongoing when the

19  Delta Fire occurred?

20  A    Yes, there is an incident management team managing the

21  Hirz Fire when the Delta Fire started.

22  Q    Okay.  And without getting all the way into the

23  specifics, what generally happened is the Delta Fire spun up

24  and resources were needed, as --

25  A    So --

26

1  Q    -- as far as getting people to work on it?

2  A    Yes.  So within the first hour of the start of the

3  Delta Fire with the close proximity of the incident

4  management team that was in command, they were able to take

5  control of the Delta and assumed command of that fire with

6  the delegation of the forest supervisor from the USDA

7  Shasta-Trinity National Forest.

8  Q    And as it progressed, did the Delta Fire, in fact, end

9  up burning portions of the Shasta-Trinity National Forest?

10  A    Yes, it did.

11  Q    All right.  Are you familiar from your work over the

12  last -- I believe you said it's 20 years you've been working

13  in the Shasta-Trinity; is that right?

14  A    So I've been with the USDA Forest Service for over 20

15  years, the Shasta-Trinity National Forest for the last three

16  years.

17  Q    Okay.  In the time that you've been here, have you

18  become familiar with an airport called the Mott Airport in

19  Dunsmuir?

20  A    Yes.

21  Q    And how have you become familiar with that?

22  A    That's an airport that we set up land use agreements

23  with preseason to help support large fire or pre-positioning

24  aircraft if needed for the season.

25  Q    Okay.  And when you say "we," do you mean Forest

Case 2:19-cr-00150-JAM  Document 33-1  Filed 11/26/19  Page 40 of 96
Case 2:19-cr-00150-JAM  Document 26  Filed 05/30/19  Page 41 of 77

27

1 Service?

2 A    That's correct, U.S. Forest Service.

3 Q    And so the Forest Service doesn't own the Mott Airport,

4 right?

5 A    That's correct, it's through Siskiyou County.

6 Q    And so why is this agreement put in place before the

7 fire season?

8 A    So if the Forest Service has an emergency -- emerging

9 incident like a fire or a planned weather event coming in,

10 such as lightning, it allows the Forest Service to place

11 resources where we can best respond and protect the forest

12 and the communities.

13 Q    And what typically is the Mott Airport used for when

14 there is a large fire event?

15 A    We've use it for helibases, and that's to stage

16 aircraft, helicopters to work out of.

17 Q    And for the Court's benefit, if you could indicate

18 through a description where the Mott Airport is in relation

19 to the Delta and Hirz Fire outlines that are on Exhibit 1 in

20 the binder in front of you.

21 A    Yes, so the Mott Airport is north of the Delta and the

22 Hirz Fire in between Dunsmuir and Mount Shasta, California.

23 Q    And are there any -- given sort of the lay of the land

24 and how fires happen in the forest, are there any particular

25 advantages to using Mott Airport as a helibase during large

65

1  Airport?

2  A    Probably at Mott a couple days before the incident

3  occurred.  Counting the two days that these incidents

4  occurred, I was Mott helibase for a total of four or five

5  days.

6  Q    All right.  I want to direct your attention to

7  September 23, 2018.  Okay?

8  A    Okay.

9  Q    On that day, did you receive a particular assignment

10  with respect to the helibase that you were to perform?

11  A    Yes, I did.  The helicopters were flying minimal

12  flights at that time of the fire.  The fire had actually

13  gotten to a point air support was not needed much.  My

14  helicopter that I was assigned directly to was not doing any

15  cargo flights, not doing any passenger flights, doing very

16  minimal aerial mapping flights.

17      So I was asked by the deck coordinator Owen Solomon to

18  go up and help perform a road guard duty at the gate of the

19  airbase, and essentially that was to provide safety while

20  the aircraft was taking off and landing.

21  Q    So I want to unpack a few things there.

22  A    Yes.

23  Q    So prior to that day, had you been up in the

24  helicopters as a part of this firefighting effort for the

25  Delta Fire?

Case 2:19-cr-00150-JAM  Document 26  Filed 05/30/19  Page 26 of 27

66

1  A    So on the incident that occurred, I had been in the

2  helicopters but had not flown in that aircraft and with the

3  pilot in specific until after the incidents.

4  Q    Right, but prior to the incident that occurred, had you

5  been up in any helicopters --

6  A    Yes.

7  Q    -- while working at the Mott Airport?

8  A    Not at Mott.

9  Q    Okay.  At the other airports?

10 A    Yes.

11 Q    All right.  Now, going to the 23rd, what you were

12 assigned to do at the gate.  I want to ask a couple

13 questions about that.

14      Now, at the time, was the airport closed altogether or

15 were you just placing certain restrictions on the airport as

16 far as the gate was concerned?

17 A    Yes.  So to break that down into a couple different

18 things.  The airport had a closure order for aircraft to not

19 be taking off or landing at the Mott Airport.  In respect to

20 that --

21 Q    Is that other than the helicopters that were there?

22 A    So, yes, that was actually for anything nonessential to

23 support of the Delta Fire.

24 Q    Okay.  During the time you were there, did anything

25 aside from the helicopters take off or land?

Case 2:19-cr-00150-JAM Document 32-1 Filed 05/30/19 Page 22 of 27

67

1  A    We had one airplane that cleared through our -- as the

2  slang terminology we use, the box, which is a mobile command

3  center.  It's also kind of like our air traffic control.

4      They cleared it through us that they needed to land due

5  to mechanical problems that this small fixed wing aircraft

6  was experiencing.  So they did get permission and did land.

7  Q    Okay.  So what particularly were you doing at the gate

8  on September 23rd when you were there?

9  A    Yeah, so I was asked to perform the duties of road

10 guard.  And what we had decided was we were not going to

11 close the base due to the fact we had miscellaneous people

12 supporting the fire such as contractors that had to come in

13 and clean the portable toilets.  We also had people

14 delivering water, lunches, other supplies.

15     And then we had members coming over from the incident

16 command post that would tie in with the helibase manager for

17 instructions and briefings on the air support.  We also had

18 members of the public that would show up.  And I do remember

19 children coming wanting to see the aircraft, wanting to ask

20 questions.  And we decided that we would be open to doing

21 that, but it was pertinent that the helicopters taking off

22 and landing would -- I guess if you want to say, that would

23 delegate me to stop the traffic and not let somebody in

24 until the aircraft was clear.

25 Q    Okay.  Now, on September 23rd before the events we're

1 traffic to proceed, but to be in a manner to bottleneck it

2 down to where we'd have more control into and out of the

3 area.

4 Q    And were you standing there just on your own or did you

5 have a vehicle with you?

6 A    So I had a vehicle that was assigned to me on the

7 incident, and that vehicle was parked so that I could have

8 an area to stage if there was no traffic coming in and out

9 for -- let's just say an hour.  And then I could get out of

10 the vehicle pretty quickly to approach somebody that wanted

11 to proceed through.

12 Q    And where in relation to the open gate was the vehicle

13 parked and why?

14 A    Yeah, so the vehicle was actually parked behind and a

15 little bit out from the gate that was fixed shut.  And the

16 reason being was I was kind of using it during my shift as

17 an indicator that I was actually parked there and that it

18 would also narrow that open gate down a little bit so that

19 whenever a car would come up to me, it wasn't with just ease

20 that they would pass on by.

21      So it was used, like I said, as an indicator that there

22 was a person up there that you needed to contact or get in

23 touch with before you proceed on through to the base.

24 Q    Okay.  And during the time you were working gate duty

25 while you were at Mott Airport, how many times did someone

Case 2:19-cr-00150-JAM Document 33-1 Filed 11/26/19 Page 45 of 96
Case 2:19-cr-00150-JAM Document 26-1 Filed 05/30/19 Page 29 of 27

75

1  license number.  He wanted to get the tail wing.  He wanted

2  him to to be addressed right now, and that if he needed to,

3  he would get law enforcement involved in reaction to the

4  last flight that took place.

5      He also asked me if I was on the helicopter that just

6  came in, which I informed him he was not -- or, excuse me,

7  that I was not.

8  Q    Okay.  What, if anything, did you tell him about

9  whether he had permission to go down to the airstrip?

10 A    So I explained to the individual that he did not have

11 permission to go down there.

12      I explained to him the reason why was that the aircraft

13 was still spinning rotors and that for public safety and the

14 safety of the firefighters that were supporting the

15 helibase, we could not have traffic going to and from these

16 helipads until the aircraft was shut down.

17      But I also further explained to him, due to the

18 accusations he made about wanting to address the pilot and

19 his demeanor, that he could not go down there.

20 Q    When the defendant asked you if you were flying on the

21 aircraft, after that point, what if anything did you tell

22 him about whether you were part of the helicopter flight

23 crew at the -- at Mott Airport?

24 A    So I informed him that I was not on the last flight

25 that took place.  I did inform him that I was a helicopter

Case 1:19-cr-00150-JAM  Document 26-1  Filed 05/30/19  Page 50 of 27

76

1 crew member supporting the Delta Fire mission and that, you

2 know, I supported the missions of that helicopter.

3      I told him the reason that I was up there was to keep

4 the public and vehicle traffic down while the missions were

5 going.  And I explained to him that the reason the

6 helicopters take off and land in a manner they do -- because

7 I do recall him saying something about the pilot

8 showboating.  I remember him saying that the airplanes take

9 off and land with the runway, why are we not doing that.

10      So I do remember explaining to him with rotor aircraft,

11 you have to take off and land due to wind directions.

12      I also explained to him that there were three other

13 helicopters on the runway and that we were trying to avoid

14 flying directly over them and that we had power lines in

15 another direction.

16      So I told him that I felt that we were safely taking

17 off and landing as we should.  But that was kind of

18 explained to him to help cool him down a little bit but to

19 give him a little idea of what the flights were doing.

20 Q    Okay.  As this was going on -- well, let me back up.

21      Did you have a walkie-talkie or any communication

22 device with you?

23 A    Yeah, we have radios, Bendix Kings, that are issued to

24 us, whether we bring them ourself or whether they're issued

25 on the fire.  And we have the frequencies that we have all

Case 2:19-cr-00150-JAM   Document 26   Filed 05/30/19   Page 81 of 90

77

1  our needed channels.  And so yes, I had one of those that

2  day.

3  Q    Okay.  And as this communication with the defendant

4  progressed, did you use that walkie-talkie to do anything?

5  A    Yeah, after the conversation went on a little bit

6  further and some more things were said to where I started to

7  view him as becoming more of a concern and potential threat

8  to us, yes, I did get on the radio.

9  Q    Okay.  And what did you do when you got on the radio?

10  A    So I ended up calling for Owen Solomon, who was the

11  deck coordinator and at the time my helicopter manager, and

12  asked him if he would come up and assist me.

13  Q    Okay.  Before anyone else arrived, while you were still

14  talking to the defendant, did he at some point make any

15  particular statements that were of particular concern to

16  you?

17  A    Yes.  So as you asked about the radio and whether I

18  used it, despite his demeanor earlier of being angry,

19  yelling, you know, a lot of explicitives (sic), and you

20  know, wanting to address the pilot, I still thought we were

21  at a level that we could communicate.

22      But then he actually looked at me as part of this

23  conversation and he said, "I will shoot that motherfucker

24  out of the sky if I have to."

25      I don't remember how much wording went on again.  But

Case 2:19-cr-00150-JAM  Document 26-1  Filed 05/30/19  Page 82 of 77

78

1  then he then stated the exact same thing again, in which I

2  realized we probably were developing into a bigger issue.

3  Q    Okay.  So two times he said those words to you before

4  anyone else arrived?

5  A    Yes, guarantee it.

6  Q    So you mentioned calling on the radio for Owen Solomon,

7  and at some point did he arrive up at the gate with you?

8  A    Yes, he did.  So I can't remember every single thing

9  that was said between the period of him threatening twice to

10  shoot at the aircraft and Owen getting there.  But Owen was

11  able to get up there in a pretty quick manner and join me

12  then.

13  Q    Okay.  After Mr. Solomon arrived, did the defendant

14  make any similar statements to the ones that you've just

15  described?

16  A    Yeah, so there was a lot of -- there was a lot of

17  saying the exact same things to Owen Solomon that he had

18  expressed to me about having an issue with the pilots

19  flying, about being irritated over the operations.  But,

20  yes, the most serious thing I considered that came out of

21  it, I noted that he told Owen the same thing, that he would

22  shoot the motherfucker out of the sky.  So that was said

23  three different times in front of us.

24  Q    When he said that to you three times, did he appear to

25  be joking?

Case 2:19-cr-00150-JAM Document 33-1 Filed 11/26/19 Page 49 of 96
Case 2:19-cr-00150-JAM Document 26 Filed 05/30/19 Page 91 of 27

87

1  Q    Okay.  And so you did go back to gate duty on September
2  24, 2018?
3  A    Yes, I did.
4  Q    And at some point that day, did you see the defendant
5  again approaching the gate in his van?
6  A    Yes, I did.
7  Q    And what did you do as soon as you saw him approaching?
8  A    So essentially he started to arrive after a different
9  helicopter.  The A-Star from the National Park Service came
10 in, which was similar to the day before.  Whatever effect he
11 gets whenever the helicopters land is when he showed up, and
12 I called Owen to tell him that the individual was coming
13 back.
14 Q    Okay.  Did the defendant stop at the gate this time
15 when he approached?
16 A    Yes.  This time he actually did not proceed past me.
17 We pulled up -- he pulled up and made eye contact together.
18 Q    Okay.  And in terms of mood, how did he appear to you
19 when he came back to the gate on September 24, 2018?
20 A    So when he pulled up, it seemed to be very similar to
21 the beginning of the first incident.
22 Q    What, if anything, did he say to you when he pulled up?
23 A    Yeah, the first thing he said, starting the
24 conversation, was he looked right at me and he said, "Did I
25 not fucking make myself clear to you yesterday or am I just

88

1 out of my fucking mind?"

2 Q    Did you say anything in response to him?

3 A    Yeah, I acknowledged the statement he made and I told

4 him that he did make his self clear and that he was acting

5 out of his mind.  I also then told him at that point that he

6 was going to need to stay there.

7      And I told him in regards to what he had said

8 yesterday, bringing law enforcement into the matter, that

9 that was going to happen.

10      So in the meantime, I did call for Owen -- excuse me, I

11 had already done that.  Owen was on his way up.  But before

12 Owen got there, I tried to explain to the defendant that we

13 had a morning briefing, that the pilots was working to get

14 further away from him and that the flights that I had

15 acknowledged was -- seemed to be what we had made the

16 agreement to do, but it wasn't working.

17      So I said law enforcement is going to be here.  Hang

18 tight.  Don't go anywhere because I'm -- at this point in

19 time, I'm done talking to you.  I don't know what you might

20 use against me if this turns into a situation.

21 Q    And when he was talking to you, did he appear angry?

22 A    Yes.  Like I said, it was a short and simple

23 conversation.  He let off with what he said and Owen got up

24 there pretty quickly.

25      But yes, it was the same as the day before.

123

1  go down to the helipad, that he had lived across the road

2  from the airport.  And I do remember your client saying that

3  he wanted to go down, he wanted to talk to the motherfucker

4  that was flying the helicopter.  He wanted his pilot license

5  numbers.  He wanted his tail number and that he would call

6  law enforcement over as he said that he was showboating.  He

7  said that -- I do recall -- I think he made mention of him

8  being in the military, he'd been around helicopters before

9  and that --

10         THE COURT:  "He" being Mr. Tobey?

11         THE WITNESS:  Yes, that is correct, your Honor.

12         And that they was flying out of an irregular

13 pattern.

14         I also remember this, even though it being odd, he

15 had described the helicopter as breaking his dishes and

16 scaring his horses when he came in.

17         So amongst taking all that in, I was trying to

18 explain to him -- when you're asking what I said, I was

19 trying to explain to him that he needed to stop.  I can get

20 somebody to come up here, which was Owen Solomon, and the

21 next day the helibase manager to address this concern, try

22 to talk this down to a level where he's much cooler, and

23 then find out exactly what's going on where we could work

24 with this individual and still proceed with our operations

25 without having a problem.

186

1  thereafter someone drove up to the gate?

2  A    Yes.

3  Q    Okay.  Can you tell the Court when you first noticed

4  that someone was coming up to the gate after the helicopter

5  landed?

6  A    I saw him pulling in so I noticed right away.

7  Q    Okay.  And so where -- when you noticed him pulling in,

8  where were you standing?

9  A    I was standing at the -- off the nose of the

10 helicopter.  I was standing in front of where the helicopter

11 lands and that was the closest landing pad to the gate.

12 Q    So you had a clear view of the gate at that point?

13 A    Yes.

14 Q    Did you -- what did you see as far as the car that was

15 approaching the gate?  Did it give you any concern?

16 A    He pulled in a little further.  Most people would stop

17 at the gate.  He -- and stop at where Jeff was standing.  He

18 pulled in a little further and Jeff had to wave his arms to

19 get him to stop.  I wasn't concerned once I saw him stop.

20 But when I saw him go past the gate, then I was concerned

21 until I saw him stop.

22 Q    Did you continue to watch after the car stopped?

23 A    Yes.

24 Q    What did you see from where you were standing?

25 A    I saw Jeff talking to the person that pulled in and I

187

1 just waited until the rotors stopped, until they were

2 slowing down and then I headed over that way.

3 Q    Why did you head over that way?

4 A    Because with him being posted there as the gate guy,

5 he's not really -- he doesn't have the authority to deal

6 with a lot of situations.  It's more like just a

7 communication thing, like hey, somebody's here type of

8 thing.  So he doesn't really make any decisions, like say if

9 it was a -- you know, it could be somebody that wants to ask

10 questions or, you know, has questions for somebody who is in

11 charge or something.  He is not the person that's in charge

12 to to deal with everything.

13 Q    Did you receive any -- well, let me back up.

14      Did you carry any kind of radio or walkie-talkie in

15 your capacity as a deck coordinator at Mott Airport?

16 A    Yes.

17 Q    Okay.  And around this time you're describing where you

18 saw the car come to the gate, did you receive any

19 communication over that radio?

20 A    Yeah.  Jeff -- I was already on my way over there and

21 Jeff called and said that -- something along the lines of

22 "We have a situation and I need you to come over here."

23          MR. STROUD:  Objection.  Hearsay.

24          MR. HALES:  Effect on the listener, your Honor.

25          THE COURT:  Overruled.

188

BY MR. HALES:

Q    You can continue.  What were you told over the radio by
Jeff?

A    I don't remember the exact words, but he was asking me
to come to the gate to help him deal with what was going on
there.

Q    Okay.  And did you in fact go up to the gate?

A    Yes.

Q    And we'll get into some details in a moment, but did
you speak to the person who was driving the vehicle when you
got up to the gate?

A    Yes.

Q    All right.  Do you see that person in the courtroom
here today that you spoke to?

A    Yes.

Q    And can you identify that individual by an article of
clothing?

A    He's got a tie on with some stripes, looks like yellow
and black and white, brown coat.

        MR. HALES:  Your Honor, may the record reflect the
witness has identified the defendant.

        THE COURT:  The record will so reflect.

        MR. HALES:  Thank you, your Honor.

BY MR. HALES:

Q    Mr. Solomon, when you arrived out to where the car was,

189

1  did you proceed to speak with the defendant?

2  A    Yes.

3  Q    Okay.  And describe the initial parts of that

4  conversation.  Who spoke first, if you remember?  What was

5  said?

6  A    Yeah, I just -- I don't remember the exact words, but I

7  said like "What's going on."  And he -- I don't remember the

8  exact words that he used either but he used a lot of words

9  and he was saying -- he was upset that the helicopter flew

10 low over his house.  He said it shook his dishes and scared

11 his animals.

12 Q    Okay.  And was he -- as he was saying this to you, did

13 he appear -- how did he appear to you?  Angry, not angry,

14 calm?

15 A    Yeah, he was angry and aggressive.

16 Q    Okay.  Was he using expletives?

17 A    Yes.

18 Q    What types of words or what phrases can you remember

19 that stick out?

20 A    The one that concerned me was something along the lines

21 of "I'll shoot the motherfucker down if I have to."

22 Q    That's your best recollection of what he said to you,

23 "I'll shoot the motherfucker down if I have to"?

24 A    Yeah.  He said he would call the cops if he has to.

25 But, yeah, that was the one that stuck out that was most

Case 2:19-cr-00150-JAM   Document 33-1   Filed 11/26/19   Page 56 of 96
Case 2:19-cr-00150-JAM   Document 33-1   Filed 08/30/19   Page 194 of 276

190

1 concerning.

2 Q    Okay.  Why did that stick out for you?

3 A    Because I'm in charge of people's safety on that

4 helibase.

5 Q    Okay.  And just prior to that statement you just

6 described, had you been discussing flight of the helicopters

7 on the airport?  I mean, what types of concerns had the

8 defendant been expressing to you before he made that

9 statement to you?

10 A    Oh, he said that he was upset about the helicopter

11 flying too low over his house and it scared his animals and

12 shook his dishes.

13      And it was a few minutes that went by.  I don't

14 remember exactly everything but it was pretty much I just

15 was letting him vent.  And then I told him that I would make

16 sure no other helicopters flew over his house.

17      And I was hoping that would solve the problem and it

18 would be over then and there.

19 Q    Not fun asking this question, but Mr. Solomon, have you

20 yourself gotten a felony assault conviction in the past?

21 A    I have.

22 Q    Okay.  Have you also received training -- and when was

23 that approximately?

24 A    2005 I think.

25 Q    Have you also in the past received any training of any

191

1  kind relating to mediation?

2  A    I have.

3  Q    Okay.  And where did you receive that?

4  A    I took a class in Fairbanks for mediation and then I

5  was a certified mediator.  And then after that, we had a

6  class in high school that was 90 percent mediation.  It was

7  called Pure Leadership, but we would mediate things that

8  would happen in the hallway and things like that between

9  students.

10 Q    Okay.  And as you spoke to the defendant on September

11 23, 2018, did you try to use any of the techniques you had

12 learned as far as mediation is concerned --

13 A    Yes.

14 Q    -- de-escalation?

15 A    Yes.  The de-escalation part, he was obviously upset

16 and I wanted to make him realize that I did care about what

17 his concerns were.  And you know, I said things like, okay,

18 so if we -- one technique is you rephrase what somebody just

19 said.

20     So if he says "He flew over my house too low and he

21 scared my animals."  So I'd say "Okay.  So I hear you saying

22 that the helicopter scared your animals and you don't want

23 us to fly over your house anymore."  You know, that would be

24 a technique that I used.  Not those exact words but it was

25 kind of like "I hear you" type of thing.

192

1  Q    Did that seem to work and de-escalate the situation a
2  little bit?
3  A    I thought so.  I thought -- because he vented for a
4  while and then when I told him that there was going to be no
5  more helicopters flying over his house, I thought that it
6  was going to be over when he left.
7      He wasn't -- he didn't say thank you and shake my hand
8  or anything like that, but he left.  And I thought it was --
9  I thought it was over.
10 Q    Okay.  At the time you said that, did you believe that
11 any helicopters had actually been flying directly over his
12 house or were you saying that to try and de-escalate the
13 situation?
14 A    No, it did fly over his house.  I didn't think it was
15 very low, but -- you know, and it's a smaller -- one of
16 those smaller helicopters.  So I wasn't concerned about the
17 helicopter, what it was doing.
18 Q    What, if anything, did you tell Mr. Tobey about what
19 you would try to do going forward to accommodate him?
20 A    Yeah, I told him that I was going to tell every single
21 pilot to not fly anywhere near his house.
22 Q    Did that seem to make him happier or calm him down?
23 A    A little bit.  A little bit.
24 Q    Okay.
25 A    I felt like that's what he wanted to hear.

193

1          THE COURT:  Counsel, could you clarify the date

2    and approximate time of the conversation you're referencing?

3    BY MR. HALES:

4    Q    Are we still talking about September 23, 2018?

5    A    Yes, the same first conversation.  First time, yes.

6    Q    Okay.  And at this point, do you recall precisely what

7    time of day it was that this happened?  Or can you give an

8    approximate?

9    A    Approximately somewhere between 11:00 and 3:00, so in

10   the middle of the day.

11   Q    Daylight hours?

12   A    Yes, daylight.

13          THE COURT:  Thank you, Counsel.

14          MR. HALES:  If I may, I'll just ask one more

15   question to clarify.

16   BY MR. HALES:

17   Q    Was there only one occasion on September 23, 2018 that

18   you spoke to the defendant?

19   A    Yes.

20   Q    Okay.  How did the conversation end with him that you

21   had?

22   A    As pretty much like "I'm going to make sure that they

23   don't fly over your house anymore."  That's about it.  And

24   then he left.

25   Q    All right.  When you were working as the deck

Case 2:19-cr-00150-JAM   Document 33-1   Filed 08/30/19   Page 206 of 27?

202

1  property, correct?

2  A    There is just the one time right before he got there,

3  yes, there was a helicopter that flew over his house.

4        MR. HALES:  Your Honor, request for clarification.

5  Helicopter not plane.

6  BY MR. STROUD:

7  Q    Yes.  There was a helicopter that flew over Mr. Tobey's

8  residence, correct?

9  A    Correct.

10 Q    And that indeed is what he was angry about; is that

11 correct?

12 A    That's what he was saying he's angry about, yeah.

13 Q    Did you think that that anger was well placed?

14 A    No.

15 Q    Why not?

16 A    Because it's not a very big helicopter and it wasn't

17 that low over his house and it was just for a moment.

18 Q    You didn't believe him that the house had been shaken

19 and it had been scaring his pets or anything like that?  You

20 didn't believe him when he said that?

21        MR. HALES:  Objection.  Relevance to whether he

22 believed him.

23        THE COURT:  Overruled.  I'll let him answer.

24 BY MR. STROUD:

25 Q    Did you believe him when he said that?

203

1  A     Well, he didn't specify what kind of animals he had.  I
2  didn't think it was going to be shaking dishes in his
3  cupboard.
4        And there was something he said about how there's like
5  debris and dust from the helicopter, and I was wondering how
6  he could see that from -- if he's inside to hear his dishes
7  shake, how can he see all the debris and dust outside at the
8  same time.
9        So I didn't have a whole lot of time to think about the
10  credibility of what he was saying.  I was thinking maybe he
11  was having a bad day, and this was just the last straw or --
12  it's noisy, but it's not enough to shake his dishes.
13  Q     So when you arrived on the scene, was it noisy at that
14  time?
15  A     The helicopter was winding down and the noise had been
16  over.
17  Q     So at that time you could hear clearly; is that what
18  your testimony is?
19  A     Yes.
20  Q     You stated, and I quote -- you told him, "I'm going to
21  make sure they won't fly over your house anymore."
22  A     Yes.
23  Q     So when you made that statement, was that a true
24  statement?  Were you going to make sure of that?
25  A     Yes.

204

1  Q    And so the next day he arrived again as well, correct?

2  A    Correct.

3  Q    And at some point in time, were you responsible for

4  calling the authorities?

5  A    I confirmed that we might need law enforcement.  Jeff

6  requested it on the radio.  He said we're probably going to

7  need law enforcement at the same time he was calling me

8  over.  And then on the way up there, I said we're probably

9  going to need an LEO.

10 Q    And what is LEO?

11 A    Law enforcement.

12 Q    And do you know if law enforcement was called?

13 A    Yes, they were.

14 Q    And was this federal law enforcement or was this state

15 law enforcement?

16 A    I don't know.  I think both showed up, but I don't know

17 who was called.

18 Q    Okay.  At some time, both showed up.  Did they both

19 show up at the same time?

20 A    Yeah -- well, within -- I don't know who all showed up

21 at first because I looked over and the defendant was gone

22 when they showed up.  And I saw a big dust cloud from his

23 yard, so I assume that's them showing up.

24 Q    And did you ever have a discussion with the county

25 sheriff in regards to Mr. Tobey?

205

1  A    I don't know who -- there might have been a couple

2  short questions to different officers that I didn't know

3  which -- who they worked for.

4        I don't recall specifically a county sheriff being

5  there, but the one that I talked to, her name is Lisa.

6  That's the one that I talked to most.

7  Q    Okay.  And did you ever tell any of the authorities

8  that you thought he was -- that you weren't really concerned

9  with your safety but you thought he was crazy?

10           MR. HALES:  Objection.  Relevance.

11           MR. STROUD:  I think that that is totally

12  relevant.  That is what this whole entire case is about.

13           THE COURT:  Overruled.

14  BY MR. STROUD:

15  Q    Did you ever tell -- you can answer.  Did you ever tell

16  an officer that you weren't concerned with your safety, you

17  thought he was crazy?

18  A    I think what I was saying, if I can remember correctly,

19  yeah, I probably said that I wasn't concerned with him

20  hurting me like at the gate.  The statement with shooting

21  the helicopter down was concerning me, but I wasn't afraid

22  that he was going to like grab a hold of me or anything like

23  that.

24  Q    So the day -- on September 23rd, did he intimate you?

25  A    Yes.  Like what's the definition of intimidation,

238

1           MR. HALES:  Objection.  Relevance.

2           THE COURT:  Overruled.

3           But, again, Counsel, we need to get there.

4           MR. STROUD:  Well, your Honor, I'm trying.

5  Basically I'm trying to get to the point that he was

6  detained and I want to know if my client said anything and

7  why he was detained and if or if not, Mr. Kubowitz exercised

8  his right to exercise him -- I mean to arrest him.  After

9  that, this witness can be dismissed.  That's where I'm

10 trying to get to.

11          So if the Court wants to help me with that or not,

12 but that's what I'm trying to achieve.

13          THE COURT:  Well, ask those questions.

14 BY MR. STROUD:

15 Q    At some point in time after detaining Mr. Tobey, did

16 you arrest him?

17 A    No.

18 Q    And why did you not arrest him?

19 A    Nothing he did fit the criteria of a crime.

20 Q    And what did you feel -- well, when you say "Nothing he

21 did," could you elaborate on that?

22 A    Statements he made to other employees.

23 Q    And how did you come to know about these statements?

24 A    I spoke to Forest Service employees at the helitack

25 base or helicopter base.

247

1  A     At his house.

2  Q     And why did you -- why did you go to his house?

3           MR. HALES:  Objection.  Relevance.

4           MR. STROUD:  Withdrawn.

5  BY MR. STROUD:

6  Q     After you went to his house, did you put Mr. Tobey --

7  was Mr. Tobey placed in your vehicle?

8  A     No.

9  Q     And so -- fine.  After you spoke with Mr. Tobey, was he

10 detained at that time?

11 A     Yes.

12 Q     And he was detained, but did you ever transport him

13 anywhere when he was detained?

14 A     I never did.

15 Q     Okay.  Who transported him?

16 A     Deputy Ortiz.

17 Q     Okay.  And so after he was transported, did you then go

18 speak with other individuals about the event?

19 A     Yes.

20 Q     Okay.  When you spoke with the other individuals, I am

21 assuming you did not speak to them at Mr. Tobey's house,

22 correct?

23 A     Correct.

24 Q     Okay.  So where did you have to go to speak to -- with

25 the other individuals?

248

1   A    The helicopter base, the helitack base or however you

2   guys are calling it.

3   Q    Okay.  Do you recall speaking with a gentleman who had

4   a very long beard?

5   A    No.

6   Q    Do you recall -- did you ever -- did you take notes for

7   this particular event?

8   A    I did.

9   Q    Did you refresh your notes (sic) before you came here?

10  A    I didn't have any notes when I was done with the call.

11  Q    So you wouldn't have any notes to refresh your

12  recollection, you didn't look over any notes or anything

13  like that?

14  A    No.

15  Q    Okay.  Do you recall if anyone told you -- if any of

16  the employees told you if they had feared for their

17  safety --

18          MR. HALES:  Objection.  Hearsay.

19          THE COURT:  And leading.  Sustained on both

20  counts.

21          MR. HALES:  May I speak further, your Honor?

22          THE COURT:  You may.

23          MR. HALES:  I think the fundamental problem here

24  is that it's the wrong witness.  I think the people that if

25  he wanted to cross-examine about where he's headed were

249

1  already on the stand and off.  And now we're trying to get

2  hearsay statements about this witness about questioning what

3  this witness did.  And it's all going to be impermissible

4  under the hearsay rule.

5          MR. STROUD:  Your Honor, because I don't want to

6  taint the witness and this problem can be solved, may we

7  approach?

8          THE COURT:  I'll hear from counsel in chambers.

9  Perhaps we can shorten this process.

10     (Proceedings recessed briefly.)

11 BY MR. STROUD:

12 Q   After you spoke with the employees at the Mott Airport,

13 did you come to understand if the employees, if they feared

14 for their lives?

15         MR. HALES:  Objection.  Hearsay.

16         THE COURT:  I'll permit a question regarding this

17 witness's understanding.

18 BY MR. STROUD:

19 Q   Yes.  What was your understanding in regards to how the

20 employees felt about the situation?

21         MR. HALES:  And objection.  Relevance as to his

22 understanding.

23         THE COURT:  Overruled.

24         THE WITNESS:  They were not in fear of their life.

25         MR. STROUD:  No further questions, your Honor.

257

1 A   Absolutely.  That morning my husband and I were having

2 breakfast watching TV.  And started to hear a loud

3 helicopter noise, which isn't uncommon.  We're used to it in

4 the fires.  Of course, they're coming.  Except that it kept

5 getting louder and louder.  And suddenly the whole house is

6 now starting to shake and it's a deeper sound than typical.

7     And the dishes -- we started hearing the dishes rattle

8 in the kitchen.  Actually, I heard one hit the floor and

9 break.

10     I looked at Jason, I'm just like -- you know.

11 Q   And did it scare you?

12 A   Absolutely.

13 Q   And you brought a dog with you today, correct?

14 A   Yes.

15 Q   What's your dog's name?

16 A   Her name is Lonnie (phonetic).

17 Q   Is that a service dog?

18 A   It is.

19 Q   Did it scare your service dog?

20 A   Absolutely.

21 Q   When you --

22     MR. HALES:  Your Honor, I'm going to start

23 objecting to relevance.  I'm not sure where we're headed,

24 but I don't see how this is relevant.

25     THE COURT:  Well, I think this is some initial

260

1  we'll hear some limited testimony regarding the motivation

2  for your client's action.

3  BY MR. STROUD:

4  Q    So that happened on September 23rd; is that correct?

5  A    Yes.

6  Q    2018.  Did the same occurrence happen the next day?

7  A    Yes, sir.

8  Q    When I say "the same occurrence," explain to the court

9  what do you mean by that.

10  A    Was asleep in bed, myself and my husband with the dog

11  beside me when the house started to shake and rattle again

12  in that same really deep sound -- sounding way.  And I kind

13  of glanced at my husband, rolled over, looked at the dog.

14  She was jumping up and looking at me like what's going on

15  here.  And I tried to calm her down a little bit.

16      And looked at my husband and I said, isn't there

17  something --

18  Q    Okay.  I don't want you to tell me what you said.

19  A    Okay.

20  Q    Just tell me what you did.  And so it's your testimony

21  that the house was shaking again --

22  A    Yes.

23  Q    -- on September 24, 2018.

24  A    Yes.

25          MR. STROUD:  No further questions, your Honor.

261

1          THE COURT:  All right.  Cross examination, Mr.

2  Hales?

3          MR. HALES:  May I have a moment, your Honor?

4          THE COURT:  You may.

5                    CROSS EXAMINATION

6  BY MR. HALES:

7  Q    Ma'am, you and your husband live directly adjacent to

8  an airport, correct?

9  A    Yes, sir.

10          MR. HALES:  No further questions, your Honor.

11          THE COURT:  Okay.  May this witness be excused?

12          MR. STROUD:  One second.  Respectfully, your

13  Honor.  One second.

14          THE COURT:  Respectfully granted.

15          MR. STROUD:  Thank you.  Thank you, sir.

16          THE COURT:  Again, though, we have a very narrow

17  scope of redirect here.

18          MR. STROUD:  Yes.

19                    REDIRECT EXAMINATION

20  BY MR. STROUD:

21  Q    You live -- so he just asked you, that you live next to

22  airport, correct?

23  A    Yes, sir.

24  Q    And is that a -- what type of aircraft usually flies

25  into that airport?

262

1  A    It's a municipal airport so it's usually small prop,

2  single-jet -- or not jet.  Little Cessnas and things like

3  that.  And occasionally some helicopters.  There are

4  small -- individuals that bring helicopters.

5      And then during training season, we have -- I think

6  they're local fire, but we've even taken pictures and video

7  for fun because it's really neat to watch them practice with

8  the ropes and things that come down and the buckets and

9  things when it's not a season where we're all really nervous

10 about fires.

11 Q    So the September 23rd shaking and the September 24th

12 shaking, was that an unusual occurrence?

13 A    Absolutely.

14        MR. STROUD:  No further questions, your Honor.

15        MR. HALES:  Nothing further, your Honor.

16        THE COURT:  May this witness be excused, Mr.

17 Stroud?

18        MR. STROUD:  Yes, your Honor.

19        THE WITNESS:  Thank you.

20        THE COURT:  Thank you.

21        Any further witnesses for the defense?

22    (The witness was excused.)

23        MR. STROUD:  Yes, your Honor, I believe so.  If

24 someone is going to testify, it is going to be my client.  I

25 would ask for a minute just to make sure that that's a

263

1  choice that I would like to make.  Otherwise, we will be

2  submitting.

3          THE COURT:  All right.  Very good.  Please take an

4  opportunity to consult with your client.

5          MR. HALES:  And, your Honor, because of the way

6  Mr. Stroud just raised that, I just want to make sure it's

7  clear on the record that Mr. Tobey knows that it's his

8  decision whether or not to testify, not counsel's decision.

9          That is indeed the law, and I think Mr. Stroud

10 just said that he was making the decision.  And it's a very

11 important constitutional matter that the defendant in a

12 criminal case know that it's his decision whether or not to

13 testify, so I want that to be clear on the record.

14         THE COURT:  Appreciate the clarification, Counsel,

15 and I'm confident that Mr. Stroud is aware of that.  But in

16 the abundance of caution.  Thank you.

17         MR. HALES:  Thank you, your Honor.

18         THE COURT:  Go ahead and take a moment to consult

19 with your client.

20     (Pause.)

21         MR. STROUD:  I understand that time is of the

22 essence, your Honor.

23         THE COURT:  You're fine.  Take what time you need

24 if it improves the efficiency of the process.

25     (Pause.)

264

1          MR. STROUD:  Your Honor, I don't know how the
2   Court wants to proceed.  And we are very close to ending,
3   but my client would like to confer with his wife.  Is that a
4   possibility or no?
5          Whatever the Court decides, we submit to the
6   Court's wisdom.
7          THE DEFENDANT:  If I can have five minutes, your
8   Honor, that would be great.
9          THE COURT:  Take a five-minute break and you may
10  confer with your wife.
11     (Proceedings recessed briefly.)
12         THE COURT:  Mr. Stroud, what is the decision of
13  the defense?
14         MR. STROUD:  After counsel weighing, your Honor,
15  we will call Mr. Jason Tobey.
16         THE COURT:  Jason Tobey.
17         Very good, Mr. Tobey, you may approach and
18  madam clerk will swear you in.
19         And, yes, you may take your refreshment with you.
20         THE DEFENDANT:  Thank you, sir.
21         JASON TOBEY - DEFENDANT'S WITNESS - SWORN
22         THE CLERK:  You may be seated.
23         THE WITNESS:  Thank you.
24  //
25  //

265

1                    DIRECT EXAMINATION

2 BY MR. STROUD:

3 Q    Mr. Tobey, on September 23, 2018, did Mr. Shiflett say

4 to you that he could do anything that he wanted?

5           MR. HALES:  Objection.  Hearsay.

6           THE COURT:  Sustained.

7           Actually, before we embark, Counsel, in the

8 abundance of caution, can we clarify your client's voluntary

9 election to proceed notwithstanding Fifth Amendment rights?

10           MR. STROUD:  Yes, your Honor.  We can -- would you

11 like me to do that?

12 BY MR. STROUD:

13 Q    Mr. Tobey, I am your attorney, you agree with that.

14 Yes?

15 A    You are my counsel.

16 Q    Yes.  And could you -- is it true that we have had a

17 lengthy discussion and you've been counseled in regards to

18 your right to not incriminate yourself under the Fifth

19 Amendment of the Constitution?

20 A    Yes, this is at a time that we've talked about the

21 Fifth Amendment.

22 Q    And have you upon your own volition decided to testify

23 today?

24 A    Yes, sir.

25 Q    And you have been counseled and you have knowledge that

266

1 it is you -- you are the driver of this case and you could

2 say no or you can say, that this decision is ultimately up

3 to you.  Do you understand that?

4 A    The weight is hitting me, yes.

5        THE COURT:  Do you understand, Mr. Tobey, by

6 electing to testify, you are waiving your Fifth Amendment

7 rights to avoid statements that might incriminate you?

8        THE WITNESS:  Yes, sir.

9        THE COURT:  All right.  Very good.  Thank you.

10        The Court finds that to be a knowing waiver and a

11 voluntary election to proceed.

12        With that, Counsel, you may question your witness.

13        The objection on hearsay grounds is sustained.

14        And you may go forward with your questions.

15        MR. STROUD:  Your Honor, I just want to make sure

16 that I am right on the rules and I have not guided my client

17 wrong.

18        I believe that the rules are that on my direct

19 examination, whatever we discuss, that the Government when

20 they do their cross, that they can only cross within the

21 scope of what we discussed, what I questioned my clients in

22 regards to my direct.  Is that the rule?

23        THE COURT:  If I understand your question

24 correctly, yes.  The scope of the cross is limited to what

25 comes out on direct.

267

1          The subject matter is then open to cross

2   examination.  It is subject to questions that you may or may

3   not have directly asked but are relevant to the topics that

4   you have opened up.

5          And the Court will permit cross examination within

6   those categories.

7          MR. STROUD:  May I approach my witness, your

8   Honor?

9          THE COURT:  You may.

10      (Pause.)

11          MR. STROUD:  Your Honor, I don't know if it's too

12   late, but we would decline, my client would decline.  After

13   the Court has given us guidance on how it would rule, we

14   would decline, my client would decline to testify and we

15   will submit on the matter.

16          And the People would -- the defendant would rest.

17          THE COURT:  I'm confused by the statement that

18   Court has provided any indication of a ruling.  Please

19   clarify.

20          MR. STROUD:  Well --

21          THE COURT:  I don't believe the Court has provided

22   any advisory opinions or advanced notice of rulings in this

23   matter.

24          MR. STROUD:  Strike that statement, your Honor.  I

25   apologize.  But it was my assessment that if I were to ask

Case 2:19-cr-00150-JAM Document 33-1 Filed 11/26/19 Page 77 of 96
Case 2:19-cr-00150-JAM Document 30-1 Filed 08/30/19 Page 292 of 296

268

1 my client -- let's say hypothetically I was going to say

2 "Did you say the cat was green on Saturday?"  Then that

3 would be the only thing that could be discussed.  But if

4 that's not the case -- and I believe it's not the case -- we

5 do not want to proceed, because I just wanted to limit the

6 scope to one particular conversation.

7          But we don't want to open the door, quite frankly,

8 to anything other than that.  And so after weighing that

9 analysis, my client is going to decline to testify.

10          THE COURT:  All right.  The Court accepts that.

11          I don't believe that the scope of the cross can be

12 unduly limited while -- that is governed by precedent and

13 the Federal Rules of Evidence.

14          The election of the defendant will be respected,

15 and there will be neither cross nor direct.

16          MR. STROUD:  Thank you, your Honor.

17          THE COURT:  And at this time the defense rests?

18          MR. STROUD:  Yes, your Honor.

19          THE COURT:  Anything further from the prosecution?

20          MR. HALES:  Your Honor, may I take a moment to

21 speak to Mr. Harris?

22          THE COURT:  You may.

23          And, Mr. Tobey, you can return to counsel table.

24     (The witness was excused.)

25          THE WITNESS:  Yes, sir.

# UNITED STATES DISTRICT COURT

for the

Eastern District of California

United States of America

v.

JASON A. TOBEY

Defendant

Case No.

3:18-mj-0024 DMC

## NOTICE OF MOTION

COME NOW, to The United States District Court, the Judge of Magistrate hearing this matter, The United States Forest Service, Officer Carson R. Harris, and any all of other interested parties, please take note that on May 7, 2019 at 11:00 a.m. at the Federal District Courthouse located at 2986 Bechelli Ln., Redding CA, 96002,  Defendant Jason A. Tobey will move this Court to make the following two rulings.

1. As a matter of right under Federal Rules of Criminal Procedure 12(b) this matter should be dismissed.
2. That Defendant Jason A. Tobey be given the opportunity participate in Pretrial Diversion.

## CASE FACTS

On the morning of September 23, 2018, an air craft flew over the home of the Defendant, Jason A. Tobey.  The aircraft flew so low over the airspace directly

Excerpts of Record, p. 76

1  over the Defendant's home, that it caused the house to shake, scaring his wife and

2  animals. The Defendant, Jason A. Tobey, went outside of his home to see what

3  was causing the commotion and saw a civilian helicopter flying so low that it

4  barely missed hitting the power lines. The Defendant witnessed the helicopter land

5  across the street from his residence at the Mott Airport. The Defendant's wife then

6  informs him that this was not the first time within the last week that the helicopter

7  has flown unsafely over their residence.

8      The Defendant is a veteran of the United States Military, and having such

9  specialized training and knowledge in regards to flying aircrafts in the airspace

10  over residential districts, he knew that the pilot was flying in an unsafe manner,

11  and "showboating."

12      Because of the unsafe manner in which the pilot was flying over the

13  Defendant's home, the Defendant drove to Mott Airport. At this time,

14  unbeknownst to the Defendant, the Mott Airport was being used as a base camp for

15  the aircrafts during the Delta incident. Defendant went to Mott Airport in an

16  attempt to find out who the pilot was that flew over his home, and why the pilot

17  was flying so low, so that he could report the pilot for the unsafe manner in which

18  he was flying.

19      When the Defendant approached the Mott Airport gate, he noticed a late

20  model gray Kia Soul parked along side the road with a dirty, long bearded male

21  sitting in the driver's seat. At this point the Defendant believed that the person

22  sitting in the Kia Soul was most likely a drug dealer as they have had numerous

23  problems with this sort of conduct in their neighborhood. Also, the vehicle was

24  unmarked and the person in the car was not in uniform nor did they have any type

25  of credentials displayed. The Defendant stopped his vehicle outside the airport

26  gate, startled and confused as to why the gate was unlocked and opened.

27      While the Defendant was sitting inside his vehicle, outside of the airport

28  gate, he was looking around to see if he could find someone that could tell him

Excerpts of Record, p. 77

1  why the airport gate was open. At this time, the Defendant saw movement out of
2  his side mirror, turned, and saw that the dirty, indigent looking man, wearing
3  mirrored sunglasses, that had been previously sitting in the Gray Kia Soul, was
4  approaching his vehicle. The Defendant backed up to the unidentified man and
5  rolled his window down when the man made a gesture to him.

6        The unidentified man looked to be in his mid 20s, with a long beard and was
7  wearing a dirty orange-brown t-shirt and dark colored dirty pants. The man then
8  barked at the Defendant, "what do you want?" At this unnecessary treatment, the
9  Defendant stated "I'm here to get the name and FAA number of the guy flying that
10 helicopter," and the Defendant pointed at the helicopter that had just flown over
11 his home. The man replied, "good luck with that," in a demeaning tone.

12       At this point, the Defendant was feeling rather anxious due to the "buzzing"
13 of his home by the helicopter, which triggered Defendant's Post Traumatic Stress
14 Disorder and was now being exacerbated by the unnecessarily aggressive, hostile
15 and demeaning manner he was being treated by the still unidentified man. Under
16 this feeling of distress, the Defendant responded "Why's that? That helicopter just
17 buzzed my house, shaking my house so hard the dishes were rattling and scaring
18 the hell and of me and my family." To which the man responded by laughing then
19 pulled a radio out from behind his back and called someone.

20       The Defendant next tried to explain to the man that the real problem was
21 that the pilot flying the helicopter was not following the prescribed FAA flight
22 path that was set up for the Mott airport. At this point another man arrived at the
23 scene on a bicycle,  neither man identified themselves, and the second man began
24 interjecting himself into the conversation, being as condescending and
25 aggressively rude as the first man. The first man responded again asking, "What
26 the hell does that matter?" The Defendant then tried to explain that Mott airport
27 was a municipal airport that had a designated flight path to eliminate the problem
28 of buzzing people's houses.  The man again responded that helicopters could go

1   wherever they wanted. At this statement, the Defendant asked, "What are you

2   telling me? That I am going to have to protect the airspace above my home?" One

3   of the men then asked the Defendant if he intended to shoot down the aircraft.

4   Being somewhat hard of hearing and thinking that he must have misunderstood the

5   still unidentified man, the Defendant asked, "Shoot it down over my house?"

6   looking for clarification on what was just said.

7         At this point, the Defendant felt very uncomfortable in this situation and

8   recognized that the situation was getting out of control, so he said, "If you actually

9   have anything to do with the helicopters, just tell that guy to stop buzzing my

10   house," and he left.

11         The next day, September 24, 2018, a helicopter again flew very low over the

12   Defendant's home. The Defendant went outside and saw the helicopter in slow

13   hover barely missing the the utility lines, complete a tail rotation, and land at the

14   Mott Airport across from his house.

15         The Defendant again went to the Mott Airport where he again saw the same

16   man sitting in the gray Kia Soul outside the gate to the airport. The Defendant

17   slowed to a stop close to the Kia Soul. The man got out of the vehicle and

18   approached the Defendant asking "What do you want now?" to which the

19   Defendant replied, "Did we just have this conversation yesterday? Did you not just

20   see that helicopter come in, hover over my house and then whip around, showing

21   off before landing?" The man replied, "Yeah, so? I already talked to them about

22   you yesterday."

23         A few moments later, another man in a black hoodie approached the

24   Defendant and the first man and asked how he could help. The Defendant

25   explained to him how the helicopter just flew in low over his house, showboating,

26   whipping his tail around and even broke a limb off of a tree in front of my house.

27   The man that the Defendant had been talking to interjected and said, "No, he just

28   wants to shoot everyone down." The Defendant then explained that that was not

1   the case, and that he was just trying to get to the bottom of the situation because

2   the way the pilot was flying the helicopter was unsafe and not a part of the flight

3   path. The unidentified man who had just arrived tried to make the excuse that the

4   helicopters had to fly in such a pattern because they could not fly over the

5   helicopters on the ground. The Defendant then told the two men that he knew this

6   was not true because he was a United States Marine and that during his service, he

7   was attached to an air wing on helicopters and therefore, he knew for a fact that

8   there was no issue with a helicopter flying over helicopters on the ground since

9   they had less space to maneuver the helicopters on the ship. The Defendant then

10   asked if he should go home and call law enforcement. He was told to do whatever

11   he thought he had to do.

12         The Defendant returned home and called the county Sheriff's office, which

13   was also done by the men at Mott Airport. A sheriff's vehicle, California Highway

14   Patrol and City of Mount Shasta Vehicle, all came to the Defendant's residence. He

15   was immediately handcuffed, placed in the back of a vehicle, and driven back to

16   the airport. The law enforcement agencies then spoke with one another and then let

17   the Defendant out of the vehicle, uncuffed him, and stated that there was no reason

18   to place him under arrest as far as they were concerned. It was at this point that a

19   U.S. Forestry service vehicle arrived with Officer Wilson inside. Officer Wilson

20   placed the Defendant in handcuffs and put him in her vehicle, then she went inside

21   one of the buildings. While officer Wilson was inside the building, several

22   unidentified individuals came by the vehicle the Defendant was being held in,

23   tapped the windows and taunted him by saying things like they knew who he was,

24   they'd make sure he rotted in jail and they'd make sure he'd pay.

25         The Defendant was then driven to the Shasta County jail where he was put

26   on a federal hold and was never told what he was being charged with.

27

28

**THE MOTION**

# I. FEDERAL RULES OF CRIMINAL PROCEDURE 12(b)

The Federal Rules of Criminal Procedure 12(b), provides that **Pretrial Motions** (1) *In General.* A party may raise by pretrial motion any defense, objection, or request that the court can determine without a trial on the merits...

Here, because *Federal Rules of Criminal Procedure 12(b)* provides that a party may raise, by pretrial motion, any defense, objection, or request, Defendant Jason Tobey may request a complete dismissal of the charges against him prior to the case being heard on the merits at trial. Therefore, the Defendant Jason A. Tobey will, and hereby does, request that the Court dismiss the current charges against him for the following reasons:

## A. THE FIRST AMENDEMENT PROTECTS VERBAL CRITISICMS

In this case, Defendant Jason Tobey is being charged with *36 Code of Federal Regulation 261.3(C):* and specifically "threatening/intimidating any Forest officer while engaged in, or on account of, the performance of duties for the protection the National Forest."

*36 Code of Federal Regulation 261.3(C)* specifically provides that you are guilty of violating this code if you committed any of the following acts:

Excerpts of Record, p. 81

1

2      "(c)  Threatening, intimidating, or intentionally interfering with any Forest officer,

3    volunteer, or human resource program enrollee while engaged in, or on account of, the

4    performance of duties for the protection, improvement, or administration of the National Forest

5    System or other duties assigned by the Forest Service."

6      The Court in *United Stated v. Willfong,* held that "The First Amendment protects verbal

7    criticism, challenges, and profanity directed at police officers unless speech is 'shown likely to

8    produce a clear and present danger of a serious substantive evil that rises far above public

9    inconvenience, annoyance, or unrest (United States v. Willfong, 274 F.3D, 1297)."

10     In this case, and in the interest of justice, the charges against Jason A. Tobey must be

11   dismissed.  The complaint alleges that the Defendant stated that he would "shoot the helicopters

12   out of the sky." This is clearly a misstatement of facts as they actually occurred.  As stated

13   above, the unidentified man asked if the Defendant was going to "shoot the helicopters out of the

14   sky," and the Defendant repeated this statement because he was confused as to what the

15   unidentified man was suggesting. The Defendant was not threatening or intimidating any person,

16   he was merely criticizing the way the helicopter pilot was flying which was not in accordance

17   with the Mott Airport flight path.

18     Further, if the Defendant was truly intimidating and threatening to the unidentified

19   persons, and they truly believed that he intended to shoot the helicopters out of the sky, why was

20   the Defendant not reported to law enforcement right away? Also, the Defendant, who was

21   wearing flip flops, shorts and a t-shirt on this day, never got out of his vehicle, did not act or

22   gesture aggressively, and he was not armed. Although Officer Wilson's report indicates that the

23   Defendant does own guns, at this point, this information was unknown to all of the unidentified

24   persons, so therefore, they would have no reason to believe that the Defendant could even shoot

25   helicopters out of the sky if he had in fact so intended.

26     Therefore,  it is clear that the Defendant intended to criticize the pilot for his failure to fly

27   in accordance with the flight path and by doing so, placing people and their homes in danger. As

28

Excerpts of Record, p. 82

such, Defendant's speech is protected under the First Amendment and the complaint against him must be dismissed because the speech was highly unlikely to "produce a clear and present danger of a serious substantive evil that rises far above public inconvenience, annoyance, or unrest, " and it was not meant to threaten or intimidate any person or officer. Further, as stated above, at no time during this verbal exchange did the unidentified individuals ever identify themselves to the Defendant as being Federal contracted employees of any kind.

# II. PRETRIAL DIVERSION

Since the Defendant was first charged in the above stated matter, he has repeatedly requested that he be allowed Pretrial Diversion. An application for Pretrial Diversion requires that any the U.S. Attorney, in his/her discretion, may divert any individual against a whom prosecutable case exists and who is not:

1. Accused of an offense which, under existing Department guidelines, should be diverted to the State for prosecution;
2. A person with two or more prior felony convictions;
3. A public official accused of an offense arising out of an alleged violation of a public trust; or
4. Accused of an offense related to national security or foreign affairs.

In this case, the Defendant Jason A. Tobey, is a perfect candidate for the pre-trial diversion program. Mr. Tobey is not accused of an offense that should be diverted to the State for prosecution, he has no prior criminal record, he is not a current or former public official, and he is not charged with an offense related to national security or foreign affairs. Further, Mr. Tobey is a veteran of the United State marine Corps. and as such, should be given a chance to

1  overcome this charge through the pre-trial diversion program. Also, it should be noted that
2  Defendant's case is being prosecuted by a U.S. Forestry officer rather than an U.S. Attorney. If a
3  U.S. Attorney was prosecuting this case, the Defendant would have been offered pre-trial
4  diversion rather than the United States incurring the burden and costs of prosecuting a costly
5  case, that is a misdemeanor, punishable by no more than a $600 fine and 6 months
6  imprisonment.   Therefore, we respectfully request that pre-trial diversion be offered to the
7  Defendant Jason A. Tobey.

8
9
10                              **CONCLUSION**
11        The Defendant is being charged with 36 CFR 261.3, in particular
12  Intimidating/Threatening a Forest officer.  In the interest of justice this charge against the
13  Defendant should be dismissed as Defendant's speech did not rise to the level of threatening or
14  intimidating an officer, the employees never identified themselves as such, and further,
15  Defendant's speech is protected under the First Amendment. Therefore, we request that the
16  charges against Defendant be dismissed.  In the alternative, we request that the Defendant be
17  offered pre-trial diversion.

18
19
20  Dated: 4|18|2019
21          Respectfully Submitted,
22
23  Natalie R Ludwig
24  TravisStroudLaw Firm
25
26
27
28

Excerpts of Record, p. 84

AO 91 (Rev. 11/11) Criminal Complaint

# UNITED STATES DISTRICT COURT
### for the
Eastern District of California

| | | |
|---|---|---|
| United States of America | ) | |
| v. | ) | |
| JASON A. TOBEY | ) | Case No. |
| | ) | 3:18-mj-0024 DMC |
| | ) | |
| | ) | |
| *Defendant(s)* | ) | |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.
On or about the date(s) of _____ September 24, 2018 _____ in the county of _____ Siskiyou _____ in the
_____ Eastern _____ District of _____ California _____ , the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 36 CFR 261.3(c) | Intimidating any Forest Officer engaged in the performance of duties for the protection of the National Forest System. |

This criminal complaint is based on these facts:

See attached Violations Report

☐ Continued on the attached sheet.

_____ 10/31/18
*Complainant's signature*

CARSON HARRIS       PATROLCAPTAIN
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 10-31-2018       _____
*Judge's signature*

City and state: _____ Redding, California _____       Dennis M. Cota, U.S. Magistrate Judge
*Printed name and title*

Excerpts of Record, p. 85

## AFFIDAVIT OF LISA WILSON IN SUPPORT OF A
## CRIMINAL COMPLAINT

Lisa Wilson, Law Enforcement Officer with the United States Forest Service, being duly sworn, depose and state:

As set forth more fully below, on September 24th, 2018, Officer Wilson arrested **JASON F. TOBEY** (DOB 08-17-1973) for making deadly threats against commercial aircraft assigned to a Federal incident. Officer Wilson is submitting this affidavit in support of a request that a criminal complaint be issued for Mr. **TOBEY** for violating Title 36, Code of Federal Regulation 261.3(c), threatening/intimidating any Forest officer while engaged in, or on account of, the performance of duties for the protection the National Forest System.

### OFFICER TRAINING AND EXPERIENCE

1. Officer Wilson is a Law Enforcement Officer with the U.S. Forest Service and has been employed since 2012. She was trained as a Forest Service Law Enforcement Officer at the Federal Law Enforcement Training Center, located in Glynco, Georgia. She has received further training in search and seizure law and many other facets of law enforcement. She has completed PC 832, state arrest and firearms training.

2. During the course of her employment as a Forest Service Law Enforcement Officer, she has participated in numerous criminal investigations and have gained knowledge and experience by working with other Officers and Agents. She has participated and gained knowledge in large demonstration crowds, people threatening and intimidating Forest Service Employees, Emotionally Disturbed Persons, people under the influence of alcohol and controlled substances, and mentally disordered persons. In order to successfully interact with these people, Officer Wilson has utilized a variety of interview techniques and resources.

3. The information contained in this affidavit is based upon Officer Wilson's personal observations, observations of other law enforcement officers, her review of official police and government reports, and consultation with other agents and officers involved in the investigation. Because this affidavit is being submitted for the limited purpose of obtaining a criminal complaint, she has not included every fact known to her concerning this investigation. She has set forth only the facts that she believes are necessary to establish probable cause.

This Affidavit is made in support of the issuance of a Criminal Complaint charging **JASON F TOBEY**, on or about September 24th, 2018, in Siskiyou County, California, in the Eastern District of California with threatening/intimidating any Forest officer while

engaged in, or on account of, the performance of duties for the protection the National Forest System, in violation of 36 CFR 261.3(c).

**BACKGROUND OF INVESTIGATION STATEMENT OF PROBALBE CAUSE**

5. On September 24, 2018, while exercising her duties as Law Enforcement Officer, U.S. Forest Service Law Enforcement Officer Lisa Wilson, #2237 was on uniformed patrol in a marked police unit, within the county of Siskiyou, in the Eastern District of California.

She states than on September 24, 2018 while exercising her duties as a law enforcement officer in the Eastern District of California, she received a report at 1006 HRS from a US Forest Service Firefighter that a male subject had entered the heliport, on September 23, 2018, at Mott Airport and had verbally accosted US Forest Service employees and other fire personnel. Mott Airport is owned by the City of Dunsmuir, however during large Federal incidents, in this particular instance helicopters assigned to the Delta Incident, the U.S. Government actively and presently manages aircraft for the purposes of landing, takeoff, and for secure overnight storage. There is a chain-link fence surrounding the airport on all sides with a gate for vehicle traffic. Owners of private aircraft stored at the airport are allowed access granted their aircraft is stored on site. Vehicle access most typically utilizes Mott Airport Road. She was told **TOBEY** was displeased in the continuous use of air space around his home and had threatened to "shoot the helicopters out of the sky," if they continued.

Approximately 40 minutes later, she received a call from the Redding Interagency Communication Center (RICC), that the male subject had returned to Mott Airport and had again threatened the aircraft. She responded to the location. Prior to her arrival at the scene, Siskiyou County Sheriff's Office Deputies responded as well, and located a male suspect matching the description at 1217 Mott Airport Road, his reported residence. She arrived at Mott Airport and located the Siskiyou County Sheriff's Deputies, who had a male suspect, identified as **Jason TOBEY** by name and date of birth, located in the back of a patrol vehicle. She also located a US Forest Service employee by the name of Jeff Schifflett. Mr. Schifflett told Officer Wilson **TOBEY** had attempted to gain access to the heliport the day previous after a helicopter had landed from the west and over **TOBEY's** home. **TOBEY** was stopped and was visibly upset. Mr. Schifflett told Officer Wilson **TOBEY** claimed the helicopter that had just landed was "show-boating," and had scared his wife and animals. Mr. Schifflett attempted to explain to him that the helicopter was not show-boating and that it had to land in the manner in which it did due to winds and terrain. **TOBEY** was displeased in this answer and told Mr. Schifflett he was going to "shoot the helicopter out of the sky." (SEE ATTACHED STATEMENT) **TOBEY** left after a short conversation.

2

**TOBEY** returned on September 24th, 2018, which was when law enforcement was called, when he again threatened to shoot a helicopter out of the sky, after it made an approach to the heliport from the south, away from the flight path of **TOBEY's** home due to the issue from the day prior. The helicopter hovered over its appointed landing spot but had to rotate the tail rotor 180 degrees due to take off adjustments. **TOBEY** left the heliport and was then contacted by the Siskiyou County Sheriff's Office. **TOBEY** was released into Officer Wilson's custody where she placed him under arrest for charge alleging 36 CFR 261.3(c), threatening/intimidating any Forest officer while engaged in, or on account of, the performance of duties for the protection the National Forest System. Officer Wilson placed him into custody due to his habitual deadly threats, close residence to the heliport, and ongoing use of the heliport by aircraft.

**TOBEY** was transported and booked in the Shasta County Jail, the closest approved Federal holding facility, where he was placed on a Federal hold until he could be retrieved for his mandatory court hearing the following day. Upon investigation, **TOBEY** had upwards of 12 registered firearms in the California DOJ Automated Firearms System and resides directly adjacent to Mott Airport.

CONCLUSION

8. She placed **TOBEY** under arrest for 36 CFR 261.3(c), threatening/intimidating any Forest officer while engaged in, or on account of, the performance of duties for the protection the National Forest System.

9. As a result of the events described above, and her training and experience, there is probable cause to believe that **JASON F. TOBEY**, on or about September 23rd and 24th, 2018, in Siskiyou County, California, Eastern District of California, did threaten and intimidate any Forest officer while engaged in, or on account of, the performance of duties for the protection of the National Forest System in violation of 36 CFR 261.3(c). Therefore, she respectfully requests that a federal criminal complaint be issued for **JASON F. TOBEY** based upon this Affidavit.

Law Enforcement Officer
United States Forest Service

Sworn to and subscribed before me this 31st day of October 2018.

DENNIS M. COTA
United States Magistrate Judge

Excerpts of Record, p. 88

<span style="color:red">APPEAL</span>

# U.S. District Court
## Eastern District of California - Live System (Sacramento)
## CRIMINAL DOCKET FOR CASE #: 2:19-cr-00150-JAM All Defendants

Case title: USA v. Tobey                         Date Filed: 08/30/2019
Magistrate judge case number: 3:18-mj-00024-DMC

---

Assigned to: District Judge John A.
Mendez

**Defendant (1)**

**Jason A. Tobey**                 represented by    **Carolyn Mary Wiggin**
                                                     Office of the Federal Defender
                                                     801 I Street
                                                     3rd Floor
                                                     Sacramento, CA 95814
                                                     916-498-5700
                                                     Fax: 916-498-5710
                                                     Email: carolyn_wiggin@fd.org
                                                     *LEAD ATTORNEY*
                                                     *ATTORNEY TO BE NOTICED*
                                                     *Designation: CJA Appointment*

                                                     **Travis E. Stroud**
                                                     TravisStroudLaw
                                                     1305 Solano St.
                                                     Corning, CA 96021
                                                     530-838-0828
                                                     Fax: 530-645-1760
                                                     Email: travisstroudlaw@yahoo.com
                                                     *TERMINATED: 09/09/2019*
                                                     *Designation: Retained*

**Pending Counts**                               **Disposition**
None

**Highest Offense Level (Opening)**
None

**Terminated Counts**                            **Disposition**
None

Excerpts of Record, p. 89

**Highest Offense Level (Terminated)**

None

**Complaints**                                                    **Disposition**

18:13-7950.P

---

**Plaintiff**

**USA**                          represented by   **Christopher Stanton Hales , GOVT**
                                                  United States Attorney's Office
                                                  501 I Street
                                                  Suite 10-100
                                                  Sacramento, CA 95814
                                                  916-554-2791
                                                  Fax: 916-554-2900
                                                  Email: christopher.hales@usdoj.gov
                                                  *LEAD ATTORNEY*
                                                  *ATTORNEY TO BE NOTICED*
                                                  *Designation: Assistant US Attorney*

| Date Filed | # | Docket Text |
|---|---|---|
| 09/25/2018 | 1 | MINUTES (Text Only) for proceedings before Magistrate Judge Dennis M. Cota: DETENTION HEARING as to Jason A. Tobey held on 9/25/2018. Request by defense counsel for OR release granted. Arraignment set for 10/31/2018 at 11:30 AM in Redding (DMC) before Magistrate Judge Dennis M. Cota. Government Counsel: Lana Cruz, Rule 180 Prosecutor present. Defense Counsel: Travis Stroud present. (Pine, C) [3:18-mj-00024-DMC] (Entered: 09/26/2018) |
| 10/31/2018 | 2 | COMPLAINT as to Jason A. Tobey. (Pine, C) [3:18-mj-00024-DMC] (Entered: 10/31/2018) |
| 10/31/2018 | 3 | MINUTES (Text Only) for proceedings before Magistrate Judge Dennis M. Cota: ARRAIGNMENT held on 10/31/2018. At request of defense counsel, arraignment continued to 11/28/2018 at 01:30 PM in Redding (DMC) before Magistrate Judge Dennis M. Cota. Government Counsel: Carson Harris, Rule 180 Prosecutor present. Defense Counsel: Travis Stroud present. (Pine, C) [3:18-mj-00024-DMC] (Entered: 10/31/2018) |
| 11/21/2018 | | MINUTES (Text Only): Due to a conflict with the Court's schedule, the arraignment set for 11/28/2018 is taken off calendar. Arraignment will be scheduled for a date mutually agreeable for the government and defense counsel. (Pine, C) [3:18-mj-00024-DMC] (Entered: 11/21/2018) |
| 11/21/2018 | | |

| | | |
|---|---|---|
| | | MINUTES (Text Only): Arraignment set for 1/9/2019 at 01:30 PM in Redding (DMC) before Magistrate Judge Dennis M. Cota. (Pine, C) [3:18-mj-00024-DMC] (Entered: 11/21/2018) |
| 01/09/2019 | 4 | MINUTES (Text Only) for proceedings before Magistrate Judge Dennis M. Cota: ARRAIGNMENT held on 1/9/2019. Defendant failed to appear. Arraignment continued to 2/13/2019 at 11:30 AM in Redding (DMC) before Magistrate Judge Dennis M. Cota. Defendant is required to appear and enter a plea to the charge. Government Counsel: Carson Harris, Rule 180 Prosecutor present. Defense Counsel: Natalie Ludwig for Travis Stroud present. (Pine, C) [3:18-mj-00024-DMC] (Entered: 01/09/2019) |
| 02/22/2019 | 5 | MINUTE ORDER signed by CPine, courtroom deputy, for Magistrate Judge Dennis M. Cota on 2/22/2019. Arraignment set for 3/6/2019 at 11:30 AM in Redding before Magistrate Judge Dennis M. Cota. Defendant's attorney is directed to notify his client of the date and time set for hearing. Defendant is required to appear and enter a plea to the charge. (Pine, C) [3:18-mj-00024-DMC] (Entered: 02/22/2019) |
| 02/25/2019 | | MINUTE ORDER (Text Only): Due to a scheduling conflict, arraignment is moved to 03/06/2019 at 1:30 PM in Redding (DMC) before Magistrate Judge Dennis M. Cota. Defense counsel shall notify his client of the change in the time set for hearing. Defendant's appearance is required. (Pine, C) [3:18-mj-00024-DMC] (Entered: 02/25/2019) |
| 03/06/2019 | 6 | MINUTES (Text Only) for proceedings before Magistrate Judge Dennis M. Cota: ARRAIGNMENT as to Jason A. Tobey held on 3/6/2019. Defendant advised of rights and charges. NOT GUILTY PLEA ENTERED. Bench Trial set for 5/9/2019 at 09:00 AM in Redding (DMC) before Magistrate Judge Dennis M. Cota. Government Counsel: Carson Harris, Rule 180 Prosecutor present. Defense Counsel: Natalie Ludwig present. (Pine, C) [3:18-mj-00024-DMC] (Entered: 03/07/2019) |
| 04/12/2019 | 7 | ASSOCIATION of ATTORNEY in the case of Jason A. Tobey. Attorney Christopher Stanton Hales, GOVT for USA added. (Hales, Christopher) [3:18-mj-00024-DMC] (Entered: 04/12/2019) |
| 04/25/2019 | 8 | MOTION to DISMISS by Jason A. Tobey. Motion Hearing set for 4/7/2020 at 11:00 AM in cvbREDD Redding before Magistrate Judge Dennis M. Cota. (Stroud, Travis) Modified on 4/25/2019 (Coll, A). Modifi [3:18-mj-00024-DMC] (Entered: 04/25/2019) |
| 04/26/2019 | | MINUTES (Text Only): Motion Hearing set for 5/7/2019 at 11:00 AM in Redding (DMC) before Magistrate Judge Dennis M. Cota. (Pine, C) [3:18-mj-00024-DMC] (Entered: 04/26/2019) |
| 05/02/2019 | 9 | OPPOSITION by USA to 8 Motion to Dismiss. (Hales, Christopher) [3:18-mj-00024-DMC] (Entered: 05/02/2019) |
| 05/02/2019 | 10 | WITNESS LIST by USA as to Jason A. Tobey. (Hales, Christopher) [3:18-mj-00024-DMC] (Entered: 05/02/2019) |
| 05/06/2019 | 11 | |

| | | |
|---|---|---|
| | | TRIAL BRIEF by USA as to Jason A. Tobey. (Hales, Christopher) [3:18-mj-00024-DMC] (Entered: 05/06/2019) |
| 05/07/2019 | 12 | MINUTES (Text Only) for proceedings before Magistrate Judge Dennis M. Cota: denying 8 Motion to Dismiss as to Jason A. Tobey; denying 8 Motion for Pre-trial Diversion as to Jason A. Tobey. The court orders trial to begin promptly at 9:00 a.m. on 05/09/2019. Witnesses are excluded from the courtroom during trial until such time as they testify. Government Counsel: Christopher Hales present. Defense Counsel: Natalie Ludwig present. (Pine, C) [3:18-mj-00024-DMC] (Entered: 05/10/2019) |
| 05/09/2019 | 13 | MINUTES (Text Only) for proceedings before Magistrate Judge Dennis M. Cota: BENCH TRIAL held on 5/9/2019 as to Jason A. Tobey. The parties shall file closing argument briefs on or before 05/24/2019. Any rebuttal shall be filed within ten days after the filing of opposing counsel's closing argument brief. Government Counsel: Christopher Hales present. Defense Counsel: Travis Stroud present. (Pine, C) [3:18-mj-00024-DMC] (Entered: 05/10/2019) |
| 05/13/2019 | 14 | TRANSCRIPT REQUEST by USA for proceedings held on 05/09/2019 before Judge Cota. Court Reporter ECRO Jonathan Anderson. (Hales, Christopher) [3:18-mj-00024-DMC] (Entered: 05/13/2019) |
| 05/15/2019 | 15 | AUDIO RECORDING REQUEST by USA for proceedings held on 05/09/2019 before Judge Cota. (Hales, Christopher) [3:18-mj-00024-DMC] (Entered: 05/15/2019) |
| 05/20/2019 | 16 | AUDIO RECORDING REQUEST for proceedings held on 05-09-2019 before Judge Dennis M. Cota. (Stroud, Travis) [3:18-mj-00024-DMC] (Entered: 05/20/2019) |
| 05/23/2019 | 17 | STIPULATION to extend closing brief deadline. (Attachments: # 1 Proposed Order)(Stroud, Travis) Modified on 5/24/2019 (Coll, A). [3:18-mj-00024-DMC] (Entered: 05/23/2019) |
| 05/24/2019 | 18 | ORDER extending deadline to file closing briefs signed by Magistrate Judge Dennis M. Cota on 5/24/2019 as to Jason A. Tobey. (Pine, C) [3:18-mj-00024-DMC] (Entered: 05/24/2019) |
| 05/29/2019 | 19 | TRANSCRIPT REQUEST for proceedings held on May 9th, 2019 before Judge Dennis M. Cota. Court Reporter ECRO Jonathan Anderson. (Stroud, Travis) [3:18-mj-00024-DMC] (Entered: 05/29/2019) |
| 05/30/2019 | 20 | TRANSCRIPT of Bench Trial Proceedings as to Jason A. Tobey held on 05/09/2019, before Magistrate Judge Dennis M. Cota. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Any Notice of Intent to Request Redaction must be filed within 5 court days. Redaction Request due 6/20/2019. Redacted Transcript Deadline set for 7/1/2019. Release of Transcript Restriction set for 8/29/2019 filed by ECRO Jonathan Anderson, Phone number 916-930-4072 E-mail janderson@caed.uscourts.gov. (Anderson, J) [3:18-mj-00024-DMC] (Entered: 05/30/2019) |
| | | |

| 06/30/2019 | 21 | BRIEF by Jason A. Tobey. (Stroud, Travis) [3:18-mj-00024-DMC] (Entered: 06/30/2019) |
|---|---|---|
| 07/01/2019 | 22 | BRIEF by USA as to Jason A. Tobey. (Hales, Christopher) [3:18-mj-00024-DMC] (Entered: 07/01/2019) |
| 08/15/2019 | 23 | Decision and Judgment issued by Magistrate Judge Dennis M. Cota on 8/15/2019. (Pine, C) [3:18-mj-00024-DMC] (Entered: 08/15/2019) |
| 08/25/2019 | 24 | [DISREGARD - Counsel to Refile] NOTICE of APPEAL by Jason A. Tobey. (Attachments: # 1 Financial Affidavit)(Stroud, Travis) Modified on 8/28/2019 (Huang, H). [3:18-mj-00024-DMC] (Entered: 08/25/2019) |
| 08/28/2019 | 25 | APPEAL OF MAGISTRATE JUDGE DECISION to District Court by Jason A. Tobey. (Filing fee $ 38, receipt number 0972-8432709) (Stroud, Travis) [3:18-mj-00024-DMC] (Entered: 08/28/2019) |
| 08/30/2019 | 26 | BRIEFING SCHEDULE re 25 Appeal of Magistrate Judge Decision to District Court, as to *Jason A. Tobey*. Date of appeal of *8/28/2019*. Magistrate case number: *3:18-mj-0024-DMC*. In Court Hearing set for 12/3/2019 at 09:15 AM in Courtroom 6 (JAM) before District Judge John A. Mendez. (Huang, H) (Entered: 08/30/2019) |
| 09/09/2019 | 27 | MOTION to appoint counsel by Jason A. Tobey. (Wiggin, Carolyn) Modified on 9/10/2019 (Kaminski, H). (Entered: 09/09/2019) |
| 09/09/2019 | 28 | ORDER signed by District Judge John A. Mendez on 9/9/19 as to Jason A. Tobey APPOINTING the Federal Defender's Office pursuant to 18 U.S.C. § 3006A. Added attorney Carolyn Mary Wiggin for Jason A. Tobey. Attorney Travis E. Stroud terminated in case as to Jason A. Tobey. (Coll, A) (Entered: 09/09/2019) |
| 09/10/2019 | 29 | TRANSCRIPT REQUEST for proceedings held on 5/7/2019 before Judge DMC. Court Reporter ECRO Jonathan Anderson. (Wiggin, Carolyn) (Entered: 09/10/2019) |
| 09/23/2019 | 30 | STIPULATION and PROPOSED ORDER re 26 Briefing Schedule -. (Wiggin, Carolyn) (Entered: 09/23/2019) |
| 09/24/2019 | 31 | STIPULATION and ORDER signed by District Judge John A. Mendez on 9/23/19 CONTINUING Briefing and hearing dates from 12/3/19 to 1/28/2020 at 09:15 AM. Defendant- Appellant's Opening Brief shall be filed and served by 11/26/2019. Plaintiff- Appellees Answering Brief shall be filed and served by 1/7/2020; and Defendant-Appellant's optional Reply Brief shall be filed and served by 1/21/20. (Mena-Sanchez, L) (Entered: 09/24/2019) |
| 11/19/2019 | 32 | MINUTE ORDER: Do to a change in the Courts availability, the appeal hearing now set for 1/28/2019 is ordered reset to Tuesday, February 4, 2019 at 9:15 a.m. (TEXT ENTRY ONLY)(Vine, H) (Entered: 11/19/2019) |

---

**PACER Service Center**

**Transaction Receipt**

Excerpts of Record, p. 93

| 11/24/2019 15:05:58 | | | |
|---|---|---|---|
| **PACER Login:** | Carolyn_Wiggin:4377836:0 | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 2:19-cr-00150-JAM |
| **Billable Pages:** | 3 | **Cost:** | 0.30 |

Excerpts of Record, p. 94