No. 2:19-cr-00150-JAM

In the United States District Court
for the Eastern District of California

———————————

**United States of America**,
Plaintiff-Appellee,

v.

**Jason A. Tobey**,
Defendant-Appellant.

———————————

On appeal from the United States District Court
for the Eastern District of California
No. 3:11-MJ-0024-DMC

———————————

**Answering Brief of the United States**

———————————

McGregor W. Scott
United States Attorney

Christopher S. Hales
Assistant U.S. Attorney
Eastern District of California
501 I Street, Suite 10-100
Sacramento, California  95814
Telephone:  (916) 554-2700

Attorneys for Appellee

# TABLE OF CONTENTS

Table of Contents ...................................................................i

Table of Authorities ...........................................................iv

Statement of Jurisdiction ....................................................1

Issues Presented for Review..................................................1

Bail Status.............................................................................2

Statement of the Case...........................................................2

   I.  Procedural History ....................................................2

   II. Tobey was convicted for threatening to shoot down
      helicopters being used by the United States Forest
      Service to fight the 2018 Delta Fire..........................3

      A.  The helicopters Tobey threatened to shoot down
          were helping the Forest Service fight the Delta
          Fire as part of an interagency effort....................4

      B.  The Forest Service employee that Tobey
          threatened was from West Virginia, and a flight
          deck coordinator from Alaska heard the threat
          as well. ................................................................6

      C.  Tobey was not arrested the first day despite his
          multiple threats, but then returned the next
          day to reiterate what he had said........................8

      D.  The court denied Tobey's request two days
          before trial to fire his retained counsel, who had
          been representing him for over six months......................10

      E.  Tobey was explicitly informed that it was his
          decision whether to testify, and he declined to
          do so after briefly taking the stand. ..................13

Summary of Argument .......................................................16

Argument....................................................................................17

I. Tobey's request to fire his retained counsel two
   days before trial was properly denied, and the court
   therefore did not need to further evaluate Tobey's
   financial eligibility for a CJA attorney. ...................17

   A. Standard of Review ...............................................17

   B. The court properly exercised its discretion to
      deny Tobey's request to fire retained counsel to
      avoid a last-minute trial continuance in a case
      with witnesses coming from the East Coast,
      Portland, and Alaska..............................................17

   C. The court was not required to further analyze
      Tobey's eligibility for appointment of counsel
      once it had properly denied his last-minute
      request to fire existing counsel. ...........................21

II. Tobey made a knowing and voluntary waiver of his
    right to testify complete with protections well
    beyond what the law requires, and his assertions of
    ineffective assistance lack support in the record. ..................22

   A. Standard of Review ...............................................22

   B. Tobey voluntarily decided not to testify after
      being advised it was his decision by the court
      and prosecutor and being afforded ample time
      to privately discuss the matter with his counsel. ..............23

      1. The record does not support the assumption
         that Tobey intended to testify under oath to
         an alternate account of the threats made on
         September 23, 2018. ......................................24

      2. Tobey's assertion that "imprecise and
         incorrect" advice led to his waiver of the
         right to testify is similarly unsupported by
         the record. ....................................................28

C.  Tobey's IAC claim regarding his decision
    whether to testify cannot be sustained on the
    trial record and fails both prongs of the
    *Strickland* test. ................................................................. 30

    1.  The trial record before the Court cannot
        sustain Tobey's IAC claim. ............................................ 30

    2.  Tobey's IAC claim fails both *Strickland*
        prongs from the start on the record before
        the Court. ....................................................................... 32

Conclusion ............................................................................................ 35

Statement of Related Cases ............................................................... 36

Certificate of Compliance ................................................................. 37

Certificate of Service .......................................................................... 38

# TABLE OF AUTHORITIES

## CASES

*Cullen v. Pinholster,*
    563 U.S. 170, 196 (2011)……………………………………………………33

*D'Aquino v. United States,*
    192 F.2d 338 (9th Cir. 1951) ..................................................27, 29

*Harrington v. Richter,*
    562 U.S. 86, 112 (2011)…………………………………………………34

*Martinez v. Ryan,*
    926 F.3d 1215, 1226 (9th Cir. 2019)…………………………………….33

*Massaro v. United States,*
    538 U.S. 500 (2003) ................................................................30, 32

*Morris v. Slappy,*
    461 U.S. 1 (1983) ...........................................................................18

*Strickland v. Washington,*
    466 U.S. 668 (1984) .................................................................30-34

*United States v. Abel,*
    469 U.S. 45 (1984) ..................................................................27, 29

*United States v. Brown,*
    785 F.3d 1337 (9th Cir. 2015) ..................................17, 18, 21, 22

*United States v. Cuozzo,*
    962 F.2d 945 (9th Cir. 1992) .........................................................29

*United States v. Nohara,*
    3 F.3d 1239 (9th Cir. 1993) ...........................................................24

*United States v. Pino-Noriega,*
  189 F.3d 1089 (9th Cir. 1999) ...............................................22, 23, 24

*United States v. Rivera-Corona,*
  618 F.3d 976 (9th Cir. 2010) ................................................17, 18, 21

*United States v. Yepiz,*
  718 Fed. Appx. 456 (9th Cir. 2017).................................................18

## STATUTES

16 U.S.C. § 551 .........................................................................................2

18 U.S.C. § 3006A ....................................................................................21

18 U.S.C. § 3231 .........................................................................................1

18 U.S.C. § 3401 .........................................................................................1

18 U.S.C. § 3402 .........................................................................................1

18 U.S.C. § 3559(a)(7) ...............................................................................2

## RULES

Fed. R. App. P. 32(a)(5).............................................................................32

Fed. R. App. P. 32(f)..................................................................................32

Fed. R. Crim. P. 58(b)(3) .............................................................................1

Fed. R. Crim. P. 58(g)(2)(B) ........................................................................1

Fed. R. Evid. 611(b)...................................................................................28

Regulations

36 C.F.R. § 261.1b ................................................................2

36 C.F.R. § 261.3(c) ..............................................................2

## STATEMENT OF JURISDICTION

The magistrate court had jurisdiction pursuant to 18 U.S.C.

§§ 3231 and 3401, Federal Rule of Criminal Procedure 58(b)(3), and

Local Rules 302(b)(3) and 431.  Judgment was entered on August 15,

2019.  ECF 23.  Defendant filed a timely notice of appeal on August

28, 2019.  Fed. R. Crim. P. 58(g)(2)(B); ECF 25.  This Court has

jurisdiction pursuant to 18 U.S.C. § 3402 and Federal Rule of

Criminal Procedure 58(g)(2)(B).

## ISSUES PRESENTED FOR REVIEW

1. Whether the court properly exercised its discretion to
   deny Tobey's request to fire retained counsel less than
   two days before trial trial where witnesses were coming to
   trial from the East Coast, Portland, and Alaska.

2. Whether, after the court properly denied Tobey's belated
   request to fire retained counsel, it had no obligation to
   further analyze Tobey's financial eligibility for
   appointment of counsel.

3. Whether Tobey made a knowing and voluntary waiver of
   his right to testify after being informed it was his decision

and being given two separate breaks to discuss the matter
privately with his retained counsel, and whether a record
devoid of information about retained counsel's actual
advice to Tobey can support an ineffective assistance
claim on direct appeal.

## BAIL STATUS

Defendant was not sentenced to imprisonment and is not in
custody.

## STATEMENT OF THE CASE

### I.    Procedural History

On October 31, 2018, Tobey was charged by complaint with
threatening, intimidating, or intentionally interfering with a Forest
officer in violation of 36 C.F.R. § 261.3(c), a Class B misdemeanor.
ECF 1.[1]  Defendant retained counsel who appeared in the Redding
magistrate court on October 31, 2018.  ECF 3.  Defendant's
arraignment was continued multiple times.  ECF 3-6.  Defendant
failed to appear for arraignment on January 9, 2019.  ECF 4.  On

---

[1] See also 36 C.F.R. § 261.1b, 16 U.S.C. § 551, and 18 U.S.C.
§ 3559(a)(7).

March 6, 2019, defendant was arraigned, and a bench trial was set in Redding for May 9, 2019.  ECF 6.

On April 25, 2019, defendant filed a motion to dismiss the case; hearing on the motion was set for May 7, 2019, two days before the bench trial.  ECF 8.  On May 2, 2019, the government filed its opposition to defendant's motion, as well as its witness list that included multiple out-of-state individuals who had traveled to the area north of Redding in September 2018 to fight the massive Delta Fire when the events at issue occurred.  ECF 9, 10.  On May 6, 2019, the government filed its trial brief.  ECF 11.

On May 7, 2019, the court denied defendant's motion to dismiss.  ECF 12.  On May 9, 2018, the bench trial started and evidence concluded.  ECF 13.  The court directed the parties to file closing arguments by written brief.  ECF 13, 18, 21-22.  On August 15, 2019, the court issued its written guilty verdict.  ECF 23.

## II.   Tobey was convicted for threatening to shoot down helicopters being used by the United States Forest Service to fight the 2018 Delta Fire.

While the Mott Airport in Dunsmuir, California was being used as a helibase to fight the Delta Fire in September 2018, Tobey drove

from his nearby house to the airport gate and angrily threatened three times to a United States Forest Service employee that he would "shoot that motherfucker [helicopter] out of the sky if I have to." Tr. 77:13-77:24, 78:13-23, 90:14-16, 114:5-19, 115:22-116:17, 115:22-116:17, 167:17-170:10, 172:22-173:7, 189:3-24; SER 66.[2] The next day, still unhappy with the helicopters, Tobey returned to the airport gate and stated to the same Forest Service employee, "Did I not fucking make myself clear to you yesterday or am I just out of my fucking mind?" Tr. 87:1-88:9. Tobey was subsequently arrested and charged with the instant violation.

### A. The helicopters Tobey threatened to shoot down were helping the Forest Service fight the Delta Fire as part of an interagency effort.

The Delta Fire started in September 2018 within the direct protection area of the Shasta-Trinity National Forest, just off the Interstate 5 corridor. Tr. 23:13-25:9; SER 1. It ultimately burned large areas of the Shasta-Trinity National Forest. Tr: 26:8-10; SER 1.

---

[2] "Tr." refers to the trial transcript, on the docket at ECF 20.

Large fire events like the Delta Fire exceed the Forest Service's capacity to fight the fire solely with local resources. Tr. 18:25-19:15. For this reason the Forest Service partners with other federal agencies, states, and private contractors to acquire the necessary resources to fight a fire. Tr. 19:9-21:3. In California, the framework for these cooperative firefighting efforts is set forth in the California Fire Management Agreement, to which the Forest Service is a party. Tr. 19:21-23:8; SER 2. As a part of the cooperative firefighting efforts, the Forest Service and Cal Fire jointly staff the Redding Interagency Emergency Command Center, and form incident management teams to acquire resources and coordinate efforts. Tr. 20:19-23:8.

For years, including in 2018, the Forest Service has had a contractual land use agreement with Siskiyou County and the city of Dunsmuir to use the Mott Airport as a helibase to stage helicopters needed for firefighting efforts. Tr. 26:11-31:10; SER 59. In September 2018, Mott Airport was being used by the Forest Service as a helibase to stage helicopters engaged in fighting the Delta Fire. Tr. 26:17-31:10, 64:1-65:5. Among others, the Forest Service had

contracted with Aspen Helicopters for use of the Bell 407 helicopter with tail N707AH to help fight the Delta Fire with aerial infrared mapping.  Tr. 31:11-42:5, 64:1-8; SER 32-45.

Tobey lives on a frontage road immediately adjacent to the Mott Airport.  Tr. 93:8-17; 261:7-9.

> **B.    The Forest Service employee that Tobey threatened was from West Virginia, and a flight deck coordinator from Alaska heard the threat as well.**

In September 2018, United States Forest Service employee Jeffrey Schiflett had come to California as a part of his job duties with the United States Forest Service in order to help fight fires burning in the state.  Tr. 62:20-64:10; 60:25-62:1.  Schiflett is a Forest Service wildland firefighter and timber sale administrator from West Virginia who has received training and certifications related to firefighting and being a helicopter crew member.  Tr. 61:1-3; 62:2-18.  In 2018 he was first assigned to the North Fire burning near Lake Tahoe, and later to the Delta Fire burning in the Shasta-Trinity National Forest.  Tr. 62:20-64:10.  Schiflett was a helicopter crew member who had been up in firefighting helicopters both before and after Tobey's threats.  Tr. 65:23-66:10; 96:13-18.

6

On both September 23 and 24, 2018, the flight deck coordinator at Mott Airport was Owen Solomon, an employee of the State of Alaska whose services had been contracted by the Forest Service to work at the helibase.  Tr. 42:7-43:16, 64:1-8, 181:21-183:25, 209:18-22; SER 46-47.

On September 23, 2018, Schiflett was performing road guard duty at the gate to Mott Airport at the direction of Solomon, for safety purposes while helicopters were taking off and landing.  Tr. 65:6-20; 67:7-24.  That day, Tobey drove up to the Mott Airport gate shortly after helicopter N707AH from Aspen Helicopter had landed.  Tr. 75:8-19, 84:18-25, 118:1-5, 230:2-19.  Tobey immediately began yelling at Schiflett with profanity about the pilot of the helicopter that had just landed and its flight path.  Tr. 74:3-75:7; 122:25-123:6.  Schiflett denied Tobey's request to drive into the airport and confront the pilot.  Tr. 75:8-19.  Schiflett further informed Tobey that Schiflett was a helicopter crew member helping fight the Delta Fire.  Tr. 75:20-76:19.  As the encounter progressed and Schiflett grew more concerned, Schiflett used his walkie-talkie to alert Solomon of the situation and asked Solomon to come up to the gate.  Tr. 77:3-12.

Tobey threatened to shoot helicopters out of the sky three times during the September 23 encounter. The first two times were directly to Schiflett, before Solomon arrived. Tobey twice told Schiflett, "I will shoot that motherfucker out of the sky if I have to." Tr. 77:13-77:24, 90:14-16, 114:5-19, 115:22-116:17. The third time Tobey made the threat, Solomon had arrived, and both Solomon and Schiflett heard it. Tr. 78:13-23, 115:22-116:17, 167:17-170:10, 172:22-173:7, 189:3-24; SER 66. Solomon similarly remembered how Tobey worded the threat: "I'll shoot the motherfucker down if I have to." Tr. 189:20-24.

The defense entered into evidence the statement that Schiflett wrote one day after the incident, which was consistent with his trial testimony that Tobey threatened multiple times to shoot helicopters down. SER 66; Tr. 150:22-152:18.

## C. Tobey was not arrested the first day despite his multiple threats, but then returned the next day to reiterate what he had said.

Despite the threats Tobey made on September 23, he was not arrested at that time. Tr. 83:4-23. Instead, Schiflett – disturbed by the threats – was replaced by a law enforcement officer at the gate

for the rest of September 23, and Tobey was allowed to go home to cool off.  Tr. 83:18-84:17, 124:12-25.

Tobey's threats were relayed to the entire helibase crew the next morning on September 24, and pilots were instructed to avoid the area of Tobey's house to the extent possible.  Tr. 85:12-86:9, 125:4-126:10, 194:8-16, 217:15-221:6.  What this meant in practice for the helicopters is that they had to take adjusted flight paths that were not considered to be the ideal safest route in and out of Mott Airport.  Tr. 217:15-221:6.

Nevertheless, later on September 24, after a helicopter had landed, Tobey drove to the Mott Airport gate again, where Schiflett had resumed gate duty.  Tr. 87:1-21.  The first words out of Tobey's mouth to Schiflett were "Did I not fucking make myself clear to you yesterday or am I just out of my fucking mind?"  Tr. 87:22-88:1.  At that point Schiflett told Tobey he needed to stay where he was and that law enforcement was now going to have to be involved.  Tr. 88:2-20.  This case followed.

### D.    The court denied Tobey's request two days before trial to fire his retained counsel, who had been representing him for over six months.

Less than two days before trial, Tobey for the first time asked the court to allow him to fire his retained counsel.[3]  ER 4:1-22.  At that point the case had been set for trial for over two months.  ECF 6.  Retained counsel had been representing Tobey for over six months.  ECF 3.  One government witness was already in the air traveling to trial from the East Coast, and others from Alaska and Portland were soon to follow, if not in the air already.  ER 6:13-16; 7:2-5.

Tobey requested the court appoint not just anyone, but a specific panel attorney with whom Tobey had already spoken, and who was present in court on May 7.  ER 3:5-13.  The prosecutor took no position on change of counsel, but opposed any continuance to the trial given the lateness of the request and that witnesses were to be en route flying to trial that day.  ER 6-7.

---

[3] The May 7, 2019 hearing commenced at 11:00 a.m. in Redding.  ER 1.

10

From the outset the court noted, "I have concerns about the timing and don't want the trial to be delayed." ER 8:25-9:1. The court directed the prosecutor to meet and confer with proposed panel counsel regarding the feasibility of switching counsel and still holding the trial as scheduled on May 9. ER 7:3-6. After a break in the proceedings, the proposed replacement counsel informed the court "there's no way I could be" ready for trial in two days. ER 11:11-18. The court indicated it understood that reality under the circumstances. ER 11:17-18.

Before ruling on Tobey's request to fire his retained counsel, the court noted several times the lateness of the request and how granting it would be disruptive to the court. ER 10:2-12:13, 13:8-11. The court specifically stated that its concerns were tied to trial delay, explaining that it would "create a substantial amount of prejudice both to the Government and to this Court to have the matter continued at this late date." ER 11:24-12:1. The court further explained, "to accommodate a change [of counsel] on the eve of trial is unduly prejudicial and is unfortunately not something I can accommodate at this point, given the status of all the parties and, as

I said, the Court as well." ER 12:10-13. The court then denied Tobey's request to fire his retained counsel. ER 13:19-14:2.

Tobey's retained counsel appeared at trial. Defense counsel came prepared with numerous exhibits including photographs, a video, and a large tree branch; made preliminary arguments regarding the scope of the charged violation based on the C.F.R. regulation in question; additionally requested judicial notice of a minimum-safe-altitude regulation in the C.F.R.; sought to ensure witnesses weren't speaking to one another about the case outside the courtroom; made an opening statement; cross examined the government's witnesses extensively including especially Jeffrey Schiflett; called two defense witnesses that included a Siskiyou County Sheriff's deputy and the defendant's wife; and filed a closing argument brief on behalf of Tobey raising a First Amendment argument as well as other defenses based on the trial evidence. Tr. 1-2, 5-9, 14:15-17:6, 44-58, 101-166, 174-178, 196-210, 212-213, 221-231, 233-249, 255-261; ECF 21.

### E.    Tobey was explicitly informed that it was his decision whether to testify, and he declined to do so after briefly taking the stand.

At the end of trial, defense counsel indicated that Tobey was the only remaining potential defense witness, and asked the court "for a minute just to make sure that's a choice I would like to make." Tr. 262:25-263:1.  At that point government counsel interjected to ensure Tobey knew it was his own personal decision whether to testify:

> AUSA:    And your Honor, because of the way Mr.
> Stroud just raised that, I just want to make
> sure it's clear on the record that Mr. Tobey
> knows that it's his decision whether or not to
> testify, not counsel's decision.
>
> That is indeed the law, and I think Mr. Stroud
> just said that he was making the decision.
> And it's a very important constitutional matter
> that the defendant in a criminal case know
> that it's his decision whether or not to testify,
> so I want that to be clear on the record.

Tr. 263:5-13.  The court agreed with the clarification, and with that clarification made, the court allowed the defense a five-minute recess to permit Tobey to talk with his wife and his counsel about whether

13

he wanted to testify, after which Tobey took the stand.  Tr. 263:18-264:11.

The record does not reflect what advice defense counsel provided Tobey during the five-minute recess, including what factors they discussed or what plan they had for his direct examination.  The attorney-client meeting was not recorded or transcribed; there are also no declarations or other information from his trial counsel, his wife, or Tobey himself in the record.

After the five-minute recess, defense counsel asked Tobey one leading question about a purported statement that Jeffrey Schiflett supposedly made on September 23, 2018.  Tr. 265:3-4 ("Mr. Tobey, on September 23, 2018, did Mr. Schiflett say to you that he could do anything that he wanted?").  Before Tobey answered, the government objected on hearsay grounds, the court sustained the objection, and the court asked defense counsel to confirm that Tobey's understanding of his Fifth Amendment rights, which counsel did.  Tr. 265:7-266:11.  Before proceeding further, defense counsel sought and received confirmation from the court that subject matters broached in direct examination are open to cross examination,

including questions that were not directly asked "but are relevant to the topics" opened by direct examination.  Tr. 266:15-267:4.

At that point the court permitted a second pause in the proceedings for defense counsel and Tobey to speak privately to one another off the record.  Tr. 267:7-10.  That attorney-client exchange was likewise not recorded or transcribed, and nothing in the record reflects its specific contents.  Tr. 267:7-10.

Once back on the record, defense counsel explained that the defense had hoped to limit Tobey's direct and cross to one particular unspecified exchange, "[b]ut we don't want to open the door, quite frankly, to anything other than that."  Tr. 268:7-8.  Defendant then declined to testify and the trial evidence concluded.  Tr. 268:10-269:4. Neither defense counsel nor Tobey disclosed what part of the case they had planned to elicit on direct, or identified the remaining portions of the case from which they had hoped to insulate Tobey on cross-examination.

## SUMMARY OF ARGUMENT

The court properly exercised its discretion to deny Tobey's request to fire retained counsel that would have caused a last-minute trial continuance where Tobey's request came less than two days before a trial that had been set for over two months, and government witnesses were coming to trial from the East Coast, Portland, and Alaska.

Once the court properly denied Tobey's belated request to fire retained counsel, it was not required to further analyze Tobey's financial eligibility for appointment of counsel under controlling Ninth Circuit precedent because Tobey was not left without counsel.

Tobey made a knowing and voluntary waiver of his right to testify complete with protections well beyond what the law requires, including explanations from the prosecutor and court and extra breaks to privately consider his decision with counsel.  Tobey's claims of ineffective assistance of counsel are based on a series of unfounded assumptions without support in the record, and Tobey fails his burden under both prongs of the *Strickland* test.

## ARGUMENT

**I.    Tobey's request to fire his retained counsel two days before trial was properly denied, and the court therefore did not need to further evaluate Tobey's financial eligibility for a CJA attorney.**

### A.    Standard of Review

On appeal this court reviews denial of a motion for substitution of counsel for abuse of discretion.  *United States v. Rivera-Corona*, 618 F.3d 976, 978 (9th Cir. 2010).

### B.    The court properly exercised its discretion to deny Tobey's request to fire retained counsel to avoid a last-minute trial continuance in a case with witnesses coming from the East Coast, Portland, and Alaska.

The court was within its discretion to deny Tobey's request to exercise his qualified right to fire retained counsel when that request was made less than two days before a trial that had been set for over two months, the court had set aside time that week both to rule on defendant's motion and for the trial, and witnesses were already either in the air or about to be in the air to Redding from locations as far away as the East Coast, Portland, and Alaska.

A defendant's right to discharge retained defense counsel is a qualified right.  *United States v. Brown*, 785 F.3d 1337, 1346 (9th

17

Cir. 2015).  The request to fire retained counsel may be denied where "a contrary result is compelled by 'purposes inherent in the fair, efficient, and orderly administration of justice.'" *Id*. at 1344, *quoting Rivera-Corona*, 618 F.3d at 979.  A trial court has "wide latitude in balancing the right to discharge retained counsel against the demands of its calendar." *Id*. at 1349 (citations and quotations omitted).  "Broad discretion must be granted trial courts on matters of continuances." *United States v. Yepiz*, 718 Fed. Appx. 456, 468 (9th Cir. 2017), *quoting Morris v. Slappy*, 461 U.S. 1, 11 (1983). "Trial judges necessarily require a great deal of latitude in scheduling trials. Not the least of their problems is that of assembling the witnesses, lawyers, and jurors at the same place at the same time, and this burden counsels against continuances except for compelling reasons." *Morris*, 461 U.S. at 11.[4]

The trial court's "wide latitude" includes the discretion to deny a  defendant's request for substitution of counsel made on the eve of trial that would necessitate a continuance, as happened here.  *Yepiz*,

---

[4] Tobey's case did not involve jurors as it was a bench trial.

718 Fed. Appx. at 468-69.  From the beginning of the discussion, the court was clear that it was concerned about a continuance given the lateness of Tobey's request.  ER 8:25-9:1.  Nevertheless, rather than dismiss the request outright, the court asked proposed replacement counsel to determine whether he could represent Tobey in the scheduled trial.  ER 7:3-6.  Only when informed that was not possible did the court deny Tobey's request to discharge his counsel, twice citing the effects it would have on the court to continue the trial at the last minute.  ER 11-13.  Under all the circumstances present in this case, the court was within its discretion to deny Tobey's late request to discharge his retained lawyer.

Tobey's new claim on appeal that he had a complete breakdown in communication with his retained counsel was not raised in the magistrate court, and is belied by the contents of his April 25 motion to dismiss.  AOB 20-22; ECF 8.  In the May 7 hearing, Tobey stated that there had been some meetings that his counsel had been unable to attend and that "I'm not feeling as though I'm able to get *all* the attention," but he never asserted a complete breakdown.  ER 4:14-15 (emphasis added).  As the court noted, Tobey's comments were made

during a hearing on a motion that counsel had actually filed on his behalf less than two weeks earlier: "At this point, we do have a motion pending before the Court brought on your behalf …." ER 5:1-2; ECF 8. Notably, that motion to dismiss contained extensive factual assertions about Tobey's view of the case, which Tobey has now argued on appeal represent what his actual trial testimony would have been. ER 8; AOB 33-34. Indeed, Tobey now argues that the filing of that motion is affirmative evidence that he "wanted to exercise his right to testify" and attributes the factual information in that filing to Tobey himself. AOB 33. This tends to refute Tobey's new argument on appeal that he was not in communication with his counsel at all in the weeks before trial.

The assertion of a breakdown in communication appears further refuted by the fact that retained counsel appeared at trial with a tree limb purporting to be from Tobey's front yard, and a video of the drive from Tobey's house to the Mott Airport entrance. Tr. 253-260.

### C. The court was not required to further analyze Tobey's eligibility for appointment of counsel once it had properly denied his last-minute request to fire existing counsel.

Having denied Tobey's belated request to fire retained counsel, the court did not need to reach the question of whether Tobey was entitled to appointment of counsel under the Criminal Justice Act. Tobey's brief collapses the two distinct applicable steps when a defendant seeks to do what Tobey did here. As the Ninth Circuit reiterated in *Brown*, the rules set forth in the *Rivera-Corona* case when a defendant requests appointed counsel to replace his retained attorney are as follows:

> (1) A defendant enjoys a right to discharge his retained counsel for any reason unless a contrary result is compelled by purposes inherent in the fair, efficient, and orderly administration of justice, and
>
> (2) *if the court allows defendant to discharge his retained counsel*, and the defendant is financially qualified, the court must appoint new counsel for him under the Criminal Justice Act ("CJA"), 18 U.S.C. § 3006A.

*Brown*, 785 F.3d at 1340 (emphasis added, explaining *Rivera-Corona*, 618 F.3d 976).

The court's decision here ended at the first step described in *Brown*, when it determined that it would not permit Tobey to fire his retained counsel on the eve of trial.  Because the second step regarding appointed counsel only applies "if the court allows defendant to discharge his retained counsel," the court did not need to proceed with any further inquiry of defendant's financial eligibility under the CJA, as defendant now contends.  *Id*.; AOB at 27-28.  Only "if the answer is yes" that a defendant is permitted to fire his retained counsel does "the CJA provide[] that counsel shall be appointed for the indigent defendant."  *Id*. at 1345.  This procedure is intended to ensure that a defendant is not left "without any counsel at all," which never happened here.  *Id*.  Tobey's argument that he was deprived of his statutory right to appointed counsel thus fails.

## II. Tobey made a knowing and voluntary waiver of his right to testify complete with protections well beyond what the law requires, and his assertions of ineffective assistance lack support in the record.

### A.  Standard of Review

On appeal a defendant's claim that he was deprived of his constitutional right to testify is reviewed *de novo*.  *United States v. Pino-Noriega*, 189 F.3d 1089, 1094 (9th Cir. 1999).

**B.    Tobey voluntarily decided not to testify after being advised it was his decision by the court and prosecutor and being afforded ample time to privately discuss the matter with his counsel.**

Here there is no question Tobey knew it was his decision whether or not to testify, and that he was afforded every opportunity to do so if he wished.  The prosecutor stated on the record that it was Tobey's decision, the court agreed, and Tobey explicitly acknowledged on the record that he knew it was his decision to make.  Tr. 263-68.  The court furthermore provided Tobey two separate opportunities to speak privately to his attorney before he ultimately declined to testify.  Tr. 264, 267.

Tobey thus made a knowing and voluntary waiver with protections well beyond what the law requires.  "[W]hile waiver of the right to testify must be knowing and voluntary, it need not be explicit." *Pino-Noriega*, 189 F.3d at 1094 (citation omitted).  "A defendant is presume to assent to his attorney's tactical decision not to have him testify." *Id*. (citation omitted).  Even though "[t]he district court has no duty to affirmatively inform defendants of their right to testify, or to inquire whether they wish to exercise that

23

right," all of that was done here to ensure Tobey understood his rights. *Id.* (citations omitted). "When a defendant remains 'silent in the face of his attorney's decision not to call him as a witness,' he waives the right to testify." *Id.*, quoting *United States v. Nohara*, 3 F.3d 1239, 1244 (9th Cir. 1993).

Defendant's remaining argument assumes ineffective assistance of counsel as a means to argue involuntariness of Tobey's waiver, without a basis in the record. AOB 33-37. The argument builds on a series of unsupported assumptions about what counsel advised Tobey and what they had actually planned for Tobey's direct examination, which are addressed below.

### 1. The record does not support the assumption that Tobey intended to testify under oath to an alternate account of the threats made on September 23, 2018.

First, there is no indication in the trial record at all that Tobey and his counsel actually planned for Tobey to provide the alternate version of the September 23 threats that was outlined in his pretrial motion and recounted in his opening brief. *See* ECF 8; AOB 33-34. There are numerous reasons to infer otherwise. That alternate version in defendant's pretrial motion was not provided under oath

and never subjected him to exposure for obstruction or perjury.  ECF
8.  That alternate version was furthermore submitted before Tobey
and his counsel saw (1) Jeffrey Schiflett repeatedly testify under oath
about Tobey's multiple threats both on direct and cross examination,
(2) Owen Solomon testify under oath, corroborating Schiflett's
testimony about the wording of Tobey's threat with his additional
firsthand account, and (3) Schiflett's prior consistent statement
entered into evidence, which was written one day after the incident
and further confirmed that Tobey had threatened multiple times to
shoot helicopters out of the sky.  See SER 66.

        In addition, Tobey's alternate narrative depended on the
assertion that he was "hard of hearing," leading to supposed
confusion in his conversation with Schiflett, yet by the time of trial
the court had had several opportunities to observe and speak to
Tobey in open court without issue, and thus had a basis to gauge the
plausibility of that assertion.  AOB 33.

        Under these circumstances, a perfectly rational trial strategy
for defense counsel would be to avoid having Tobey directly deny
making the threats under oath or being cross-examined about them,

25

for fear of exposing him to a court finding of obstruction that could affect his sentence, or worse, exposing him to liability for perjury, all while still trying to attack the character of a central government witness.

What little indication there is in the record regarding the plan for Tobey's direct examination supports the opposite of the assumption Tobey would now have this Court make.  The sole question asked was not about the threats, but about a supposed statement by Schiflett made to Tobey that could make Schiflett look bad: "Mr. Tobey, on September 23, 2018, did Mr. Shiflett say to you that he could do anything that he wanted?"  TR. 265:3-4.  Defense counsel explained that he hoped to limit cross solely to the inverse of his questions, rather than to other questions on the same subject matter opened by direct, or to potential bias: "[L]et's say hypothetically I was going to say 'Did you say the cat was green on Saturday?' Then that would be the only thing that could be discussed."  Tr. 268:1-3.  By that logic, the only thing the government could have done on cross would have been to ask, "Mr. Schiflett never said that he could do anything that he wanted, did he?" without

probing anything else about the September 23 encounter, or probing Tobey's potential bias for giving such testimony about Schiflett.[5]

The record does not reveal the parts of the case to which Tobey and his counsel "[didn't] want to open the door, quite frankly."  Tr. 268:7-8.  Tobey identifies nothing to refute the idea that the threats portion of the September 23 conversation was the very thing the defense was trying to avoid on cross examination.  Given the overall subject matter of this case and the trial testimony to that point, it is hard to imagine any other topic to which it would have been so important for the defense to avoid Tobey's cross examination under oath.

The court should reject Tobey's invitation to assume that he would have testified to the account outlined in his pretrial motion, because that assumption lacks any support in the record, and Tobey had his clear chance to testify about it and declined in any event.

_____

[5] Of course, the law would not support such an absurd result. Bias is always a "permissible and established basis of impeachment," *United States v. Abel*, 469 U.S. 45, 50 (1984), and "[c]ounsel cannot bring out favorable parts of a conversation and then preclude his opponent from developing on cross-examination the unfavorable parts."  *D'Aquino v. United States*, 192 F.2d 338, 371 (9th Cir. 1951).

### 2. Tobey's assertion that "imprecise and incorrect" advice led to his waiver of the right to testify is similarly unsupported by the record.

Next, though the record contains no transcript or recounting of Tobey's two private attorney-client conversations with his counsel about testifying at trial, Tobey asks this court to conclude "that the advice Mr. Stroud gave [Tobey] was imprecise and incorrect," and argues by extension that this caused an involuntary waiver. AOB 35. The Court should reject the invitation to assume its way to such a conclusion based on conversations the contents of which are not even in the record.

The risk of making such an assumption is highlighted by the fact that Tobey declined to testify after the court correctly advised his counsel regarding the general scope of cross examination, and then Tobey and his counsel had a chance to speak privately. Tr. 266-67. While counsel had previously hoped to limit cross to the inverse of the specific questions he asked (Tr. 268), the court correctly stated that direct examination opens up cross on the same "subject matter," including "questions that you may or may not have directly asked but are relevant to the topics you have opened up." Tr. 267; *see* Fed.

R. Evid. 611(b); *United States v. Cuozzo*, 962 F.2d 945, 948 (9th Cir. 1992) ("[a] defendant who testifies in her own defense waives her right against self-incrimination and subjects herself to cross-examination concerning any matters reasonably related to the subject matter of her direct testimony").

Tobey's decision not to testify after discussion with his counsel makes strategic sense given that Tobey and his counsel "[didn't] want to open the door, quite frankly, to anything other" than the specific questions they planned. Tr. 268. One or more questions about Tobey's September 23 conversation with Schiflett could easily have opened up cross examination to the entire conversation that day, and to the case generally to explore Tobey's potential bias for attacking Schiflett. *See Abel*, 469 U.S. at 50 (bias is always a "permissible and established basis of impeachment"); *D'Aquino*, 192 F.2d at 371 ("[c]ounsel cannot bring out favorable parts of a conversation and then preclude his opponent from developing on cross-examination the unfavorable parts").

Thus, Tobey's claim that his waiver was caused by imprecise and incorrect legal advice has no support in the record, and those few

29

inferences that can be drawn from the sequence of events at trial actually tend to suggest the opposite.  Tobey's argument that bad advice rendered his waiver involuntary fails and should be rejected.

> ### C.    Tobey's IAC claim regarding his decision whether to testify cannot be sustained on the trial record and fails both prongs of the *Strickland* test.

> #### 1.    The trial record before the Court cannot sustain Tobey's IAC claim.

Finally, this Court cannot grant Tobey's ineffective assistance of counsel (IAC) argument on direct appeal based on a record that contains no information about what trial counsel actually said to Tobey in their private conversations.  As the Supreme Court has explained:

> Under *Strickland v. Washington*, 466 U.S. 668, [] (1984), a defendant claiming ineffective counsel must show that counsel's actions were not supported by a reasonable strategy and that the error was prejudicial. The evidence introduced at trial, however, will be devoted to issues of guilt or innocence, and the resulting record in many cases will not disclose the facts necessary to decide either prong of the *Strickland* analysis."

*Massaro v. United States*, 538 U.S. 500, 504–05 (2003).

This is such a case, and it exemplifies why the Supreme Court in *Massaro* adopted a rule furthering the preference for addressing IAC claims through 28 U.S.C. § 2255 petitions rather than on direct appeal. *Id.* at 504-508. This Court cannot even start the *Strickland* analysis because it does not know what advice Tobey's trial counsel gave regarding Tobey's decision whether to testify, let alone what specific strategic objectives shaped that advice, or whether those strategic objectives met an objective standard of reasonableness as measured by "prevailing professional norms." *Strickland*, 466 U.S. at 687-88.

There are a number of reasons why counsel might have advised Tobey not to testify, assuming that is in fact the advice he gave. Counsel might have concluded that in light of the preceding trial evidence, opening Tobey up to cross examination regarding his potential bias and his full conversation with Schiflett on September 23 would have been counterproductive or worse for the defense, and even led to adverse sentencing consequences. Or counsel might have learned that having Tobey deny the threats would have entailed suborning perjury and ethically recommended against that course.

31

Simply assuming one speculative scenario over another in the absence of evidence cannot form the basis for granting an IAC claim. As the Supreme Court further explained in *Massaro*, "[w]hen an ineffective-assistance claim is brought on direct appeal, appellate counsel and the court must proceed on a trial record not developed precisely for the object of litigating or preserving the claim and thus often incomplete or inadequate for this purpose." *Massaro*, 538 U.S. at 504–05.

### 2. Tobey's IAC claim fails both *Strickland* prongs from the start on the record before the Court.

If the Court nevertheless proceeds to analyze the merits of Tobey's IAC claim by prong, that claim fails manifestly on the record before it. Under *Strickland*, Tobey bears the burden of proving that (1) his counsel's performance fell below an objective standard of reasonableness as measured by "prevailing professional norms," and (2) that counsel's performance prejudiced him. *Strickland*, 466 U.S. at 687-88. On the first prong, "the question is not whether counsel's actions were reasonable, but whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard."

*Martinez v. Ryan*, 926 F.3d 1215, 1226 (9th Cir. 2019) (citations and quotations omitted).

In evaluating counsel's performance, the relevant inquiry is whether "counsel's assistance was reasonable considering all of the circumstances." *Strickland*, 466 U.S. at 688. A court must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689. The court must furthermore "evaluate the conduct from counsel's perspective at the time." *Id.* Thus, the court is required "not simply to give the attorneys the benefit of the doubt, but to affirmatively entertain the range of possible reasons [the defendant's] counsel may have had for proceeding as they did." *Cullen v. Pinholster*, 563 U.S. 170, 196 (2011) (citations and quotations omitted).

Even if a defendant shows that his counsel's performance was unreasonable by *Strickland*'s deferential standard, he must also show that, but for counsel's errors, there is a reasonable probability that the outcome of the proceeding would have been different in order to prevail on his claim. *Strickland*, 466 U.S. at 694. To constitute *Strickland* prejudice, "[t]he likelihood of a different result

33

must be substantial, not just conceivable." *Harrington v. Richter*, 562 U.S. 86, 112 (2011).

Tobey's IAC claims fails both prongs from the start. Tobey has not identified the specific advice he received or the reasons behind it; he has not demonstrated why that advice was unreasonable according to prevailing professional norms at the time based upon all of the circumstances of the case, including information known to counsel and the preceding trial evidence; and Tobey has not demonstrated a substantial likelihood of a different result at trial had he simply denied the threats that were testified to by Schiflett and corroborated by Solomon, particularly given that Tobey would have been subject to full cross-examination and a potential government rebuttal case.

///

///

///

///

///

///

34

### CONCLUSION

The government respectfully requests that this Court affirm defendant's conviction.

<div style="margin-left: 50%;">

Respectfully submitted,

MCGREGOR W. SCOTT
United States Attorney

/s/ Christopher S. Hales
CHRISTOPHER S. HALES
Assistant United States Attorney

</div>

## STATEMENT OF RELATED CASES

The government is not aware of any related cases.

## CERTIFICATE OF COMPLIANCE

This brief complies with the length limits permitted by Ninth Circuit Rule 32-1.  The brief is 6,349 words, excluding the portions exempted by Fed. R. App. P. 32(f), if applicable.  The brief's type size and type face comply with Fed. R. App. P. 32(a)(5) and (6).


DATED:                                    /s/ Christopher S. Hales
                                          CHRISTOPHER S. HALES
                                          Assistant United States Attorney

37

## CERTIFICATE OF SERVICE

I hereby certify that on January 28, 2020, I electronically filed the foregoing with the Clerk of the Court for the United States District Court for the Eastern District of California by using the CM/ECF system.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

/s/ Christopher S. Hales
CHRISTOPHER S. HALES
Assistant United States Attorney